YIU SING CHUN and Jee-Chiu Shan, Appellants,

v.

Charles C. SAVA, District Director, Immigration and Naturalization Service, New York District, and Kevin Doyle, Deputy Assistant District· Director for Detention and Deportation, Immigration and Naturalization Service, New York District, Appellees.

No. 912, Docket 82–2368.

United States Court of Appeals, Second Circuit.

Argued Feb. 16, 1983.

Decided May 19, 1983.

Robert F. Belluscio, (Chu, Chung, & Chiu, New York City), for appellants.

Thomas B. Roberts, Asst. U.S. Atty., Brooklyn, N.Y. (Raymond J. Dearie, U.S. Atty., E.D.N.Y., Miles M. Tepper, Asst. U.S. Atty., Brooklyn, N.Y., of counsel), for appellees.

Before OAKES and NEWMAN, Circuit Judges, and TENNEY, District Judge.*

OAKES, Circuit Judge:

This case presents the question whether aliens who are stowaways seeking political asylum are entitled to a hearing before an immigration judge after their applications for asylum have been denied by an Immigration and Naturalization Service (INS) District Director. After holding that the INS District Directors had not abused their discretion in denying Yiu Sing Chun and Jee-Chiu Shan, two young men from the People's Republic of China, asylum status under the Refugee Act of 1980, 8 U.S.C. §§ 1158(a),[1] 1101(a)(42)(A),[2] the United

---

* Of the Southern District of New York, sitting by designation.

1. 8 U.S.C. § 1158(a) (Supp. V 1981) provides:
   The Attorney General shall establish a procedure for an alien physically present in the

United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum, and the alien may be grant-

2. See note 2 on page 870.

States District Court for the Eastern District of New York, Joseph M. McLaughlin, Judge, 550 F.Supp. 90, held that they were not entitled to an exclusion hearing because they were stowaways and, as such, denied procedural rights by 8 U.S.C. § 1323(d).[3] We reverse the second holding and remand to the agency for a hearing at which Chun and Shan will be entitled to renew their request for asylum.

## BACKGROUND

The facts may be briefly stated. Yiu Sing Chun and Jee-Chiu Shan illegally left the People's Republic of China by swimming from Canton to Hong Kong and then stowed away on the "American Lark" bound for Oakland, California, and New York. When they were discovered after the vessel was underway, or as they state, when they presented themselves to the crew, they identified themselves as refugees seeking political asylum. The Captain placed them in detention and notified INS. When the ship arrived in California, each filed a Form I–589 applying for asylum. A Chinese-speaking employee of the shipping line, who neither was a lawyer nor spoke English well, helped Chun and Shan complete the forms. Chun's form indicated that he would face a jail sentence because of his illegal departure and that he had been "persecuted" at school after speaking out "against the working class condition during political class discussion, and compare [sic] them with the Western Free world"; it also noted that his father was a businessman, a social class "generally oppressed and sneered upon." Shan's I–589 claimed he could not tolerate the Communist society, and that having spoken out against the Communist system he had been sent "to the farms for hard labor"; and that since his grandparents were property owners, "we belong to a social class that is generally oppressed and sneered upon." The INS San Francisco District Director, in accordance with the asylum application regulations,[4] referred the applications to the Asylum Division, Bureau of Human Rights and Humanitarian Affairs, Department of State (BHRHA), which took the view that the applicants "had not established a well-founded fear of persecution within the meaning of the United Nations Protocol Relating to the Status of Refugees." The BHRHA gave the following reason for its conclusion:

ed asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title.

2. 8 U.S.C. § 1101(a)(42)(A) (Supp. V 1981) defines the term "refugee" as

any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion....

This definition, established by the Refugee Act of 1980, conforms domestic law "with our international treaty obligations under the United Nations Protocol Relating to the Status of Refugees which the United States ratified in November 1968, and the United Nations Convention Relating to the Status of Refugees which is incorporated by reference into United States law through the Protocol." S.Rep. No. 256, 96th Cong., 2d Sess. 4 (1980), reprinted in 1980

U.S.Code Cong. & Ad.News 141, 144. See treaty text infra note 25.

3. 8 U.S.C. § 1323(d) (1976) provides in part:

The owner, charterer, agent, consignee, commanding officer, or master of any vessel or aircraft arriving at the United States ... who fails to detain on board ... any alien stowaway until such stowaway has been inspected by an immigration officer, ... shall pay ... $1,000 for each alien stowaway .... Pending final determination of liability for such fine, no such vessel or aircraft shall be granted clearance .... The provisions of section 1225 of this title for detention of aliens for examination before special inquiry officers [text at note 17 infra] and the right of appeal provided for in section 1226 of this title [text at note 18 infra] shall not apply to aliens who arrive as stowaways and no such alien shall be permitted to land in the United States, except temporarily for medical treatment, or pursuant to such regulations as the Attorney General may prescribe for the ultimate departure or removal or deportation of such alien from the United States.

4. 8 C.F.R. 208.7.

The applicant has not been persecuted in the past in the People's Republic of China (PRC). PRC officials have adopted a rather permissive attitude toward emigration, legal and illegal. The typical penalty imposed for violations of Article 176, Section 6 of Chinese Criminal Law (illegal departure) is fifteen days detention. The maximum penalty, in serious cases, is one year which, in the unlikely event it were imposed, would constitute prosecution and not persecution.

The District Director denied the requests for asylum. His written decision of July 20, 1982, noted no allegations in the application form of prior persecution of the men or their families, and no credible testimony of a well-founded fear of persecution in the interviews by an immigration officer.[5] He concluded that neither Chun nor Shan qualified as a "refugee" under 8 U.S.C. § 1101(a)(42)(A), note 2 supra, and found them statutorily ineligible for asylum. Further, because they did not apply for refugee status at the office of the American Consulate General in Hong Kong, he found them unworthy of a favorable exercise of the Attorney General's discretion.

While their applications were considered the petitioners were confined on the "American Lark," en route to New York by way of Panama and Savannah, Georgia, where Chun and Shan were served with the San Francisco District Director's decision. Two days after the New York arrival, with the assistance of counsel, both Chun and Shan filed new applications for asylum and supporting documents which are perhaps inconsistent in two or three particulars with the first application, but which elaborate extensively their reasons for leaving the People's Republic and what they fear would happen to them if they returned.[6] Petitioners were taken off the "American Lark" and placed in the Immigration Detention Facility in Brooklyn. INS forwarded the updated applications to the BHRHA for a second advisory opinion, but did not conduct a second interview. The State Department recommendation merely reiterated the recommendation made to the INS District Director in San Francisco. We note that the petitioners, contrary to applicable regulations,[7] apparently had no opportunity to

5. 8 C.F.R. 208.6 requires that an immigration officer or judge examine an asylum applicant in person before the adjudication of the application. The "testimony" referred to by the District Director would have been this interview.

6. Chun asserts that this was his second attempt to flee the People's Republic of China, and that he was apprehended in March of 1982, fined $150, and spent 14 days in prison. Chun claimed in his Form I–589 supplement that his problems with the authorities stem from his status as a "second generation bourgois [sic] class member."

If I were sent back to China, the regime would charge me with high treason, plus ... charges such as counter-revolutionaryism .... I am sure that I would spend all my life in prison .... I know that I would walk into jail and will never walk out. I would rather kill myself here.

Shan's Form I–589 supplement stated that, because his grandparents were members of the landowning class prior to the revolution, he has been discriminated against. He claims to have been subjected to "mind rehabilitation" from 1977 until 1981. In April of 1982 he apparently wrote an article critical of Chinese economic policy and maintains that, if he had stayed in China he

would be arrested soon because they deemed me as anti-communist.... I would not return to China because if you are charged as an anti-communist or counter-revolutionary, you would be put to death I know that if I should go back, I would be put to death. Therefore, I would rather die here instead of going back.

7. 8 C.F.R. 208.8(d) provides:

Decision based on BHRHA opinion. If the decision is based in whole or in part on a BHRHA opinion, the opinion is to be made a part of the record of proceeding unless it is classified under Executive Order No. 12065 (3 CFR 190, June 28, 1978). If the BHRHA opinion is included in the record, the applicant shall be given an opportunity to inspect, explain, and rebut the opinion, as prescribed in § 103.2(b)(2) of this chapter.

Given our decision to remand for an asylum hearing before an immigration judge, we need not resolve the District Director's apparent abuse of discretion in not permitting the applicants to seek to meet their burden of proof of a "well-founded fear of persecution" with material, e.g., from Amnesty International, or to rebut the State Department's opinion as to the "rather permissive attitude" of the People's Republic towards illegal emigration. These materials

rebut at a hearing the points made by the BHRHA. The District Director in New York, adopting the State Department's recommendation, denied the second applications for asylum without elaboration and ordered the petitioners excluded. Upon receipt of notice of the New York District Director's decision, Chun and Shan filed habeas corpus petitions challenging INS procedures in the adjudication of their asylum applications, as well as the INS denial of temporary parole status.

After Judge McLaughlin upheld the INS Director's discretionary denial of asylum and parole, Chun and Shan brought a contempt motion to require the INS to provide an exclusion hearing at which the men could renew their applications for asylum before a Special Inquiry Officer, to whom we shall refer as an immigration judge. 8 C.F.R. § 1.1(1). Judge McLaughlin concluded that the jurisdiction of the immigration judge was statutorily circumscribed by 8 U.S.C. § 1323(d)'s explicit denial of exclusion hearings to stowaways, and that the hearing requirement of the asylum regulations did not apply to stowaways.[8] We granted a stay of removal and repatriation to the People's Republic of China pending our decision in the appeal from both of Judge McLaughlin's orders.

## DISCUSSION

The Refugee Act of 1980, Pub.L. No. 96–212, 94 Stat. 102 (1980), was a response to the urgent needs of those subject to persecution in their homelands. *Id.* § 101(a). We have characterized the Act as "the end product of an evolutionary process in the law of asylum." *Stevic v. Sava,* 678 F.2d 401, 404 (2d Cir.1982), *cert. granted,* —— U.S. ——, 103 S.Ct. 1249, 75 L.Ed.2d 479 (U.S.1983). In *Stevic* we traced the origins of the Refugee Act in pre-1968 asylum law, *id.* at 404–05, the United Nations Protocol Relating to the Status of Refugees, *id.* at 405–06, and asylum law from 1968 to 1980, *id.* at 406–07, and the Refugee Act of 1980 itself, *id.* at 407–08. So far as is pertinent we will assume familiarity with the *Stevic* opinion.[9] Of concern to us here is Congress's direction to the Attorney General to establish "a new uniform asylum procedure" that would be consistent with treaty obligations. H.Conf.Rep. No. 781, 96th Cong., 2d Sess. 20 (1980), *reprinted in* 1980 U.S.Code Cong. & Ad.News. 160, 161. Thus, the Act required the Attorney General to "establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum." *See supra* note 1. The question before us is whether, under the statute and the Attorney General's regulations delineating "a procedure ... to apply for asylum," the petitioners, arriving at a port of entry as stowaways, are entitled to a hearing before an immigration judge on the issue whether they are refugees within the meaning of the Act, and therefore entitled to asylum.[10]

will be put before the immigration judge. *See generally* Note, *The Right of Asylum Under United States Immigration Law,* 33 U.Fla.L. Rev. 539, 547–55 (1981).

8. On the basis that they were not seeking "free" passage petitioners now dispute that they were stowaways, but their Forms I–589 concede that they were such and we do not think they can go beyond, or rather behind, them.

9. To the extent that *Stevic* held that the standard for determining when an applicant meets the substantive requirements of the statute to be treated as a refugee has changed from one of "clear probability" to one of "well-founded fear" based upon "good reason"—the point on which the Supreme Court has granted its writ of certiorari—*Stevic* is not relevant here because this case involves only procedural questions.

10. This issue was not reached by the Court of Appeals for the Eleventh Circuit in *Garcia v. Smith,* 674 F.2d 838, *rehearing denied,* 680 F.2d 1327 (11th Cir.1982). The Government maintains that in the opinion denying a rehearing the court "denigrated" the arguments advanced here by petitioners. We cannot adopt this reading of *Garcia.* The court remanded to ensure that a stowaway had the opportunity to present the merits of his asylum claim. *Garcia* simply stated that—as is the case with any other claim—"[h]owever unlikely it is that [the petitioner's] argument is correct, he is entitled to raise it," as long as the district court has subject matter jurisdiction. 680 F.2d at 1328. The court specifically stated that it "impl[ied] no judgment on the validity of [the] claim." *Id.* at 1329.

The asylum procedure adopted by the Attorney General pursuant to the directive of the Refugee Act of 1980 is set forth in 8 C.F.R. Part 208. There are five steps in the asylum procedure: preparation and filing of the application for asylum,[11] examination in person by an immigration officer or judge,[12] an advisory opinion from BHRHA,[13] a written decision of the District Director, which may not be appealed,[14] and renewal of the denied asylum request before an immigration judge in exclusion or deportation proceedings.[15] With just the foregoing in mind it would be plain that because the refugee asylum procedure applies, in the words of the statute, "irrespective of such alien's status," and because the

regulations promulgated by the Attorney General under the Act do not differentiate a stowaway from any other "applicant for admission," petitioners are to be "placed under exclusion proceedings" where they may renew their requests for asylum before an immigration judge.

But the Government argues that, unlike other excludable aliens under 8 U.S.C. § 1182(a), stowaways are not entitled to procedures provided other excludable aliens.[16] The Government cites 8 U.S.C. § 1323(d), which provides in part that "the provisions of section 1225 ... for detention of aliens for examination before special inquiry officers[17] and the right of appeal provided for in section 1226[18] ... shall not

---

**11.** Application for political asylum is made on Form I–589. 8 C.F.R. 208.2. The application is filed with the District Director when, as in this case, the applicant is seeking admission to the United States, *id.* 208.3(a)(1).

**12.** 8 C.F.R. 208.6. *See supra* note 5.

**13.** Upon receipt of a Form I–589 the District Director in all cases requests an advisory opinion from BHRHA. 8 C.F.R. 208.7. When immigration judges consider an asylum request in a deportation or exclusion hearing, they request a BHRHA opinion if one has not already been received in connection with an application to the District Director, or if they find that there has been a substantial change of circumstances. *Id.* 208.10(b). If relied on, the applicant may rebut the advisory opinion, *id.* 208.8(d), *supra* note 7, as well as present record evidence in an exclusion or deportation proceeding before the immigration judge. *Id.* 208.10(c), (d).

**14.** 8 C.F.R. 208.8(b), (c). The District Director is instructed to deny a request for asylum if any of six specified facts exists, including a determination that the applicant is not an alien within the meaning of the Act. *Id.* (f)(1)(i)–(vi); *see infra* note 24.

**15.** 8 C.F.R. 208.9. The regulations further provide: "If an asylum request by an applicant for admission is denied, he/she shall be expeditiously placed under exclusion proceedings, unless the applicant elects to withdraw the application for admission." *Id.* 208.8(f)(3).

**16.** Most classes of "excludable aliens," 8 U.S.C. § 1182(a), are entitled to an exclusion hearing, *id.* § 1226(a), with appeal to the Attorney General, *id.* § 1226(b), and, ultimately, court review by way of a habeas petition, *id.* § 1105a(a)(6). Section 1323(d) by its terms, however, denies stowaways a hearing and the right to appeal from an exclusion order.

**17.** 8 U.S.C. § 1225(a) provides in part:

The inspection ... of aliens (including alien crewmen) seeking admission ... shall be conducted by immigration officers, except as otherwise provided in regard to special inquiry officers. All aliens arriving at ports of the United States shall be examined by one or more immigration officers at the discretion of the Attorney General and under such regulations as he may prescribe.... The Attorney General ... shall have power ... to take and consider evidence ... whether he belongs to any of the excluded classes enumerated in section 1182 of this title.

8 U.S.C. § 1225(b) provides:

Every alien (other than an alien crewman), and except as otherwise provided in subsection (c) of this section and in section 1323(d) of this title, who may not appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land shall be detained for further inquiry to be conducted by a special inquiry officer. The decision of the examining immigration officer, if favorable to the admission of any alien, shall be subject to challenge by any other immigration officer and such challenge shall operate to take the alien, whose privilege to land is so challenged, before a special inquiry officer for further inquiry.

**18.** 8 U.S.C. § 1226(a) provides in part:

A special inquiry officer shall conduct proceedings under this section ... present and receive evidence, and interrogate, examine, and cross-examine the alien or witnesses. He shall have authority in any case to determine whether an arriving alien who has been detained for further inquiry under section 1225 of this title shall be allowed to enter or shall be excluded and deported. The determination of such special inquiry officer shall be based only on the evidence produced at

apply to aliens who arrive as stowaways." The effect of § 1323(d), the Government says, is not only to make a District Director's order of exclusion against a stowaway final, but also to make a District Director's denial of asylum to a stowaway final, as held under pre-1980 Act law. *See, e.g., Kordic v. Esperdy,* 386 F.2d 232 (2d Cir.1967), *cert. denied,* 392 U.S. 935, 88 S.Ct. 2301, 20 L.Ed.2d 1393 (1968). Although the INS concedes that the Refugee Act of 1980 requires the Director to establish uniform procedures for asylum applications "irrespective of [an] alien's status," 8 U.S.C. § 1158(a), it argues that the Act requires only that the actual application form and the procedure associated with a District Director's determination need be uniform. And although the INS regulations themselves do not distinguish between stowaways and other aliens in providing that an exclusion proceeding follows denial of an asylum request, 8 C.F.R. 208.8(f)(3), and that an asylum request may be renewed before an immigration judge in that proceeding, 8 C.F.R. 208.9, INS asks us to read into these regulations a qualifier: aliens whose asylum applications are denied may reassert their asylum claim in an exclusion hearing *only if they are entitled to such a hearing under other provisions of the Act.*

We are thus required to answer the Government's argument that, although a plain reading of the asylum application procedures grants Chun and Shan a hearing before an immigration judge, another statute removes that right because they are alien stowaways. The Government emphasizes and we are well aware of the presumption that a new, general statute does not generally effect an implicit repeal of an earlier, specific statute. *United States v. United Continental Tuna Corp.,* 425 U.S. 164, 169, 96 S.Ct. 1319, 1323, 47 L.Ed.2d 653 (1976). Rather, our duty is to give harmonious operation and effect to all statutory

provisions if possible, absent some explicit indication of legislative intent derived from either the words of the statute or its legislative history. *See, e.g., Watt v. Alaska,* 451 U.S. 259, 267, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80 (1981); *Morton v. Mancari,* 417 U.S. 535, 549–51, 94 S.Ct. 2474, 2482–83, 41 L.Ed.2d 290 (1974). We disagree with the Government's contention that § 1323(d) mandates that stowaways seeking asylum are entitled only to a District Director's determination on the asylum issue. We believe that the Refugee Act of 1980 and § 1323(d) can be harmonized by reading the refugee regulations—particularly 8 C.F.R. 208.9(f)(3)—to require a hearing before an immigration judge limited to the asylum issue for stowaways seeking admission as refugees. We think that this result is not inconsistent with § 1323(d), and that it best accommodates congressional intent that the "Attorney General ... establish a uniform procedure for passing upon an asylum application" under the Refugee Act. S.Rep. No. 256, 96th Cong., 2d Sess. 16, *reprinted in* 1980 U.S.Code Cong. & Ad.News 141, 156.

Despite the fact that Chun and Shan are stowaways, their procedural rights as *asylum applicants* derive from the Refugee Act of 1980. Section 1323(d) is a specific provision detailing the treatment afforded alien stowaways. This provision must be read in light of § 1182 which defines "general classes" of "[e]xcludable aliens." Although § 1182(a)(18) lists "[a]liens who are stowaways" as an excludable class, § 1182(a) contains a proviso stating that its definitions are applicable "[e]xcept as otherwise provided in this chapter." The Refugee Act limits the effect of § 1323(d) by "otherwise provid[ing]" that aliens applying for asylum may do so "irrespective of ... status." 8 U.S.C. § 1158(a). Whatever procedural limitations § 1323(d) might impose in the absence of § 1158, we hold that these limitations are not applicable in the asylum

the inquiry. . . . Proceedings before a special inquiry officer under this section shall be conducted in accordance with this section, the applicable provisions of sections 1225 and 1357(b) ... and such regulations as the Attorney General shall prescribe, and shall

be the sole and exclusive procedure for determining admissibility of a person to the United States under the provisions of this section. Appeal on the record is to the Attorney General. *Id.* § 1226(b).

context to the extent and only to the extent that an asylum determination is involved.

As we have noted above, INS regulations promulgated under the Refugee Act do not distinguish between stowaways and other aliens in providing for an exclusion hearing after the District Director has denied an asylum application, 8 C.F.R. 208.9, 208(f)(3), nor, read as a whole, does the agency's asylum procedure make any distinction among applicants for asylum.[19]  Nor do internal INS procedures ("Operations Instructions") qualify in any way the generalization that an "alien shall be informed of his/her right to renew the asylum request ... in subsequent exclusion or deportation proceedings."  INS O.I. 208.14, *reprinted in* 4 C. Gordon & H. Rosenfeld, Immigration Law and Procedure 23–156.20 (rev. ed. 1982).  Indeed, in explaining the need for statutory and regulatory changes to prevent use of the "asylum process, with its attendant delays, as a convenient method to prolong an excludable or deportable alien's stay in the United States," an Acting Commissioner of the INS stated that "[p]resent law and regulations permit a claim of asylum to be raised before a Service district director, and again before an immigration judge in the context of a deportation or exclusion hearing."[20]  We think it fair to infer what the regulations now require from the proposed changes.  The Acting Commissioner's own example of the Mariel Boatlift refugees—many of whom were certainly stowaways—indicates that stowaways, like all other aliens, enjoy full procedural rights in applying for asylum.[21]

This agency guidance on the issue of aliens' procedural rights seems to support our interpretation of the regulations.  An agency's interpretation of its own regulations, and the statute under which they are promulgated, is of course entitled to substantial deference.  *See, e.g., Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 565, 100 S.Ct. 790, 796, 63 L.Ed.2d 22 (1980).  The INS makes a policy argument against our interpretation, however, that we do not lightly cast aside.  Specifically, the INS maintains that because the regulations establish a procedure for applying for a refugee visa at a United States embassy in a foreign country, 8 C.F.R. Part 207, and applicants who are denied such visas are entitled to no further hearing, *see Van Shih Hsieh v. Kiley,* 569 F.2d 1179, 1181 (2d Cir.), *cert. denied,* 439 U.S. 828, 99 S.Ct. 102, 58 L.Ed.2d 121 (1978), stowaways who bypass our embassy should not be afforded any different or greater procedural protection.  To do so, it is said, would encourage people to stow away rather than to follow established procedures.

---

**19.** When INS announced the proposed rules that became 8 C.F.R. Part 208, it stated that the District Director

will consider all applications for asylum with the exception of an application filed after the alien has been placed in exclusion or deportation proceedings....  An application denied ... may be renewed in exclusion or deportation proceedings before an immigration judge.  The burden is on the applicant to show that he is eligible....  The application will be denied if the alien does not come within the definition of refugee under the Act, [et al.].

45 Fed.Reg. 37,392 (1980).  Stowaway status is *not* one of the reasons for denying an asylum application listed in the Federal Register notice or the regulations.  *Id.* at 37,392; 8 C.F.R. 208.-8(f)(i)–(vi).

**20.** Meissner, Proposed Revisions in Asylum Procedures and Law, 30 INS Rep., Spring-Summer-Fall 1981, at 1, 2.  In contrast to 3,702 applications in 1978, and 5,801 in 1979, some 53,034 persons physically present in the United States filed asylum applications in the fifteen months following passage of the Act.  Additionally, approximately 50,000 Cuban nationals filed for asylum in early 1980 as a result of the Mariel Boatlift.  *Id.* at 1.  *See generally* Scanlan, *Regulating Refugee Flow: Legal Alternatives and Obligations Under the Refugee Act of 1980,* 56 Notre Dame Law. 618 (1981) (discussing impact of refugee problem on United States implementation of right to asylum).

**21.** Although commentators have not specifically addressed whether nonfavored aliens such as stowaways are entitled to a hearing after a District Director's denial of an asylum application, they do generally state that asylum relief is uniformly available to excludable and deportable aliens.  *See, e.g.,* Scanlan, *supra* note 20, at 621–22; Note, *The Right of Asylum Under United States Law,* 80 Colum.L.Rev. 1125, 1130 (1980).

Whether the intricacies of American immigration law would be known or have any effect on a prospective refugee is speculative. In any event, Congress itself distinguished aliens present in the United States or "at a land border or port of entry" and other refugees. 8 U.S.C. §§ 1158(a), 1157(c).[22] The policy argument urged by INS highlights a bit of a logical anomaly, but we view it as simply another example of different patterns woven into the same legislative tapestry. In short, we are distracted by it, but not convinced.

We conclude that the Refugee Act of 1980's asylum procedures and § 1323(d) can be reconciled by allowing stowaways a hearing limited to the asylum claim, followed by whatever other procedural rights other asylum applicants are afforded. Because the hearing we require will be limited solely to the issue of asylum eligibility, we preserve the basic thrust of § 1323(d)'s command that stowaways are not entitled to exclusion hearings. As stowaways, the petitioners are entitled to nothing more; as asylum seekers at our border, they are entitled to nothing less. The name the proceeding goes by is immaterial. The Government, of course, argues that the approach we take here works a repeal of § 1323(d). We think that our holding enables § 1323(d) to be read in harmony with the Refugee Act, thus maintaining "strict observance of our international obligations concerning those who genuinely flee perse-

cution in their homeland." Exec. Order No. 12324, 3 C.F.R. 180, 182 (1982).

Nothing that we have said, of course, goes to the substantive question whether petitioners are in fact entitled to be treated as asylees. Resolution of this question requires the development of a factual record, for Congress, in accordance with treaty law, has instructed the INS to deny asylum in certain circumstances, including a determination that an alien applicant is not a refugee within the meaning of the Act.[23] And of course the Attorney General *shall not* deport or return alien refugees, as a matter of statutory law, 8 U.S.C. § 1253(h)(1), as well as of treaty law, United Nations Protocol, *supra*, art. 33(1).[24] Congress's limitation on the Attorney General's discretion requires careful fact-finding. Were the substantive question before us, the issue on appeal would be whether there was substantial evidence on the record as a whole to support the INS decision, *McMullen v. INS*, 658 F.2d 1312, 1316 (9th Cir.1981); *see also Stevic v. Sava*, 678 F.2d at 404, and whether the INS decision was based on the requirements of statute and treaty.

Finally, our construction of the statute and the regulations is aided to some extent, if not guided, by what we perceive to be the dictates of procedural due process. We say this full well knowing that the alien seeking initial admission is requesting a privilege and has very limited rights regarding his application. *Fiallo v. Bell*, 430 U.S. 787,

**22.** The class of aliens who may apply under § 207 of the Refugee Act as refugees is different from—though in part overlapping—the class which may apply under § 208 as asylees. International law has long distinguished diplomatic asylum and territorial asylum. 1 A. Grahl-Madsen, The Status of Refugees in International Law § 5 (1966).

**23.** 8 C.F.R. 208.8(F)(1)(i). The standards parallel treaty law. *Compare* 8 U.S.C. §§ 1101(a)(42), 1253(h)(2)(A)–(D); 8 C.F.R. 208.8(F)(1)(i)–(vi), *with* United Nations Convention Relating to the Status of Refugees, extended by United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 6260, T.I.A.S. No. 6577, at art. 33(2).

**24.** Commentators urge that "a duty of states to refrain from action which may lead to the return of a refugee to a country where he may

become the victim of persecution" is also a rule of customary international law, a rule qualifying the doctrine of states' unlimited right to regulate the admission of aliens of their frontiers. Weis, *The International Protection of Refugees*, 48 Am.J.Int'l L. 193, 198–99 (1954); *see generally* Comment, *Can the Boat People Assert a Right to Remain in Asylum?*, 4 U. Puget Sound L.Rev. 176 (1980). Another treatise writer comments that although many governments, including Austria, Belgium, France, the Federal Republic of Germany, Italy, Norway, Sweden, and Switzerland, confer a right to be granted asylum under municipal law, the decisions have been based on humanitarian rather than legal grounds and, as such, are not evidence of a rule of international law. 2 A. Grahl-Madsen, *supra* note 22, at § 182 (1972).

792, 97 S.Ct. 1473, 1477, 52 L.Ed.2d 50 (1977). But a refugee who has a "well-founded fear of persecution" in his homeland has a protectable interest recognized by both treaty [25] and statute,[26] and his interest in not being returned may well enjoy some due process protection not available to an alien claiming only admission. Because the severity of harm to the erroneously excluded asylee outweighs the administrative burden of providing an asylum hearing, if the regulations did not do so already the INS arguably would be required to provide a hearing before an immigration judge to determine whether applicants for asylum are, in fact, refugees within the meaning of the Act.[27]

Reversed and remanded for further administrative proceedings.

**25.** See Stevic, 678 F.2d at 407. The United Nations Protocol, supra note 23, to which the United States became a signatory in 1968, incorporated the 1951 Convention Relating to the Status of Refugees, which declares that

No Contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.

Id. art. 33(1). A refugee is defined as a person who

owing to well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country.

Id. art. 1. Congress conformed domestic law to this treaty obligation in the Refugee Act of 1980. 8 U.S.C. §§ 1253(h)(1), 1101(a)(42)(A). Thus, the United States appears to recognize a liberty interest, the right of nonrefoulement for a refugee.

A protectable property interest, analogizing to Logan v. Zimmerman Brush Co., 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), has been recognized by some courts, in the form of a right to petition for asylum and to be heard on that petition. Haitian Refugee Center v. Smith, 676 F.2d 1023, 1037–39 (5th Cir.1982) (right under pre-1980 asylum regulations); Orantes-Hernandez v. Smith, 541 F.Supp. 351, 374–76 (C.D.Cal.1982); Nunez v. Boldin, 537 F.Supp. 578, 584–87 (S.D.Tex.1982). Haitian Refugee Center held that the INS "accelerated program of processing Haitian asylum and deportation cases deprived the plaintiffs of due process of law." 676 F.2d at 1041. The court required INS to adhere to its established procedures, i.e., a hearing at a meaningful time and in a meaningful manner. Orantes-Hernandez preliminarily enjoined INS summary removal of Salvadorans without notice of their right to apply for asylum and a knowing and intelligent waiver of that right. 541 F.Supp. at 376–78. Nunez v. Boldin required notice to detainees of their right to apply for political asylum, 537 F.Supp. at 584–87, because the

United States has, by treaty, statute, and regulations, manifested its intention of hearing the pleas of aliens who come to this country claiming a fear of being persecuted in their homelands. The intention is not necessarily stated as granting the privilege of asylum to all who come to this country but of hearing those pleas.

Id. at 584.

**26.** 8 U.S.C. § 1253(h)(1), as amended by the Refugee Act of 1980, prohibits deportation or return of an alien "to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion." Excludable as well as deportable aliens are protected.

**27.** Use of this Mathews v. Eldridge, 424 U.S. 319, 334–35, 96 S.Ct. 893, 902–903, 47 L.Ed.2d 18 (1976), analysis in the immigration context has been suggested by the Supreme Court in Landon v. Plasencia, —— U.S. ——, 103 S.Ct. 321, 330, 74 L.Ed.2d 21 (1982), to be sure, however, in the case of a returning resident alien.