777 F.2d 68
 Yakoub Rattib AZZOUKA, Appellee,
v.
Charles C. SAVA, District Director, New York District,
United States Immigration and Naturalization Service, and J.
Scott Blackman, Assistant District Director for Detention,
Deportation, and Parole, New York District, Appellants.
 No. 1339, Docket 85-2109.
 United States Court of Appeals,
Second Circuit.
 Argued June 10, 1985.
Decided Nov. 12, 1985.
 
 Michael D. Patrick, Sp. Asst. U.S. Atty. (Rudolph W. Giuliani, U.S. Atty. for S.D.N.Y., Noel Anne Ferris, Sp. Asst. U.S. Atty., Jane E. Booth, Asst. U.S. Atty., New York City, of counsel), for appellants.
 Samia Fam, Legal Intern, New York University School of Law (James A. Cohen, Paul Davison, Legal Intern, Washington Square Legal Services, Inc., New York City, of counsel), for appellee.
 Before FRIENDLY, OAKES and WINTER, Circuit Judges.
 OAKES, Circuit Judge:
 
 
 1
 This case raises a novel question concerning the relationship between section 235(c) of the Immigration and Nationality Act of 1952, 8 U.S.C. Sec. 1225(c) (1982) ("Act"),[1] and the procedures provided applicants for political asylum pursuant to the Refugee Act of 1980, 8 U.S.C. Secs. 1101(a)(42), 1158, 1253 (1982), and the regulations promulgated in accordance with the Refugee Act, 8 C.F.R. Sec. 208 (1985). The Immigration and Naturalization Service (INS) summarily excluded Yakoub Rattib Azzouka from this country under section 235(c) for being a threat to "the public interest" or the "welfare, safety, or security of the United States." 8 U.S.C. Sec. 1182(a)(27). Nevertheless, Azzouka filed an application for political asylum, which the INS in turn summarily denied, claiming that the exclusion determination under section 235(c) barred Azzouka from seeking asylum as a "danger to the security of the United States," 8 C.F.R. Sec. 208.8(f)(1)(vi), and that Azzouka was not entitled to an asylum hearing before an immigration judge. The United States District Court for the Southern District of New York, Leonard B. Sand, Judge, then granted Azzouka's petition for a writ of habeas corpus requiring the INS to allow an immigration judge to hold a hearing on Azzouka's claim for political asylum, relying on our decision in Yiu Sing Chun v. Sava, 708 F.2d 869 (2d Cir.1983). We reverse and remand.
 
 BACKGROUND
 
 2
 Azzouka, a Yemenese national of Palestinian extraction carrying a valid Yemenese passport, arrived in the United States on September 8, 1984, and sought to enter the country pursuant to a legitimate nonimmigrant visitor's visa. Azzouka told INS officials that he intended to visit a cousin living in Virginia for a month and then to return to Yemen. He made no mention at that time of his desire to seek asylum here. When his belongings were examined, however, INS officials found various false documents including two fraudulent passports. Moreover, they discovered that he had no return ticket to Yemen. Although the passport and visa he was using were valid, the officials decided to refuse entry under section 235(b) of the Act, 8 U.S.C. Sec. 1225(b), considering Azzouka an alien not "clearly and beyond a doubt entitled to land." They determined that Azzouka might well be excludable under sections 212(a)(19), 8 U.S.C. Sec. 1182(a)(19) (procuring visa by fraud), and 212(a)(20), id. Sec. 1182(a)(20) (immigrant without valid immigration visa). Azzouka then surrendered himself to INS custody and elected to appear before an immigration judge on the issue of excludability.
 
 
 3
 Before that hearing could take place, Azzouka was charged on September 12 in the Eastern District of New York with violating 18 U.S.C. Sec. 1543 (1982), which proscribes the "willful use" of false passports. The Government, however, soon amended its theory of criminal liability and instead indicted Azzouka for three violations of 18 U.S.C. Sec. 545 (1982), the smuggling statute, which prohibits passing false papers through the customhouse. After moving to dismiss the indictment on the ground that section 545 does not apply to false travel documents, cf. United States v. Borello, 766 F.2d 46, 53 (2d Cir.1985) (suggesting that under section 545 "the importation of goods would necessarily be involved"), Azzouka entered into an agreement to talk with the FBI concerning his knowledge about the Palestine Liberation Organization (PLO), for which Azzouka had apparently worked as clerk, messenger, and driver for two years prior to his departure from Yemen in September. In exchange, the Government dropped all criminal charges in January 1985.
 
 
 4
 On February 5, 1985, INS cancelled the exclusion proceedings begun in September and placed Azzouka under the more restrictive category of temporary exclusion pursuant to section 235(c). See supra note 1. In response Azzouka submitted a four-page letter to the Regional Commissioner, the INS official charged with making the exclusion determination under section 235(c).[2] The letter described Azzouka's relationship with the PLO and asserted that Azzouka did not constitute a "hazard to the nation's security." At the same time, counsel stated that Azzouka would be filing an application for asylum and that under our decision in Chun, "Mr. Azzouka is entitled to a hearing on the merits of his asylum claim notwithstanding the fact that he may be otherwise excludable without a hearing under section 235(c)." Azzouka based his application on a claim of well-founded fear of persecution by the PLO, alleging that if he returned to the Middle East he "would be severely punished and possibly executed by the PLO because [he] deserted that organization for political reasons."[3] In his brief before this court, counsel states that this asylum request had been planned for some time before February but that Azzouka's inability to find adequate immigration counsel postponed the filing of the application.[4]
 
 
 5
 On February 27, the Regional Commissioner found Azzouka summarily excludable under section 235(c) as an alien deemed excludable under section 212(a)(27) of the Act, 8 U.S.C. Sec. 1182(a)(27), which applies to aliens whose conduct "would be prejudicial to the public interests or endanger the welfare, safety, or security of the United States." The Regional Commissioner made no determination as to what part of paragraph (27) Azzouka fell under. The Regional Commissioner held that his decision was "based upon confidential information, the disclosure of which would be prejudicial to the public interest, safety or security of the United States." As a result, pursuant to section 235(c), Azzouka was excluded without a hearing before an immigration judge.
 
 
 6
 Shortly thereafter, on March 5, Azzouka filed a petition for habeas corpus in federal district court to enjoin his deportation until he received a hearing before an immigration judge on his asylum claim and to force the District Director--the INS official charged with making the determination about asylum claims--to make a decision. The next day the District Director denied Azzouka's application for asylum on the basis that the Regional Commissioner had already determined that Azzouka was excludable under section 1182(a)(27), and that he was therefore ineligible for asylum under 8 C.F.R. Sec. 208.8(f)(1)(vi): "[t]here are reasonable grounds for regarding the alien as a danger to the security of the United States," thus mooting Azzouka's second claim. Azzouka maintained, however, that as a bona fide asylum applicant subject to exclusion he was entitled under Chun to a hearing before an immigration judge on his asylum claim, including a hearing on whether he constitutes a danger to national security. The Government countered that Chun was distinguishable as not involving security risks and that Azzouka could only directly challenge the Regional Commissioner's discretionary section 235(c) determination.
 
 
 7
 The district court granted Azzouka's habeas petition, remanding to INS "for a hearing at which petitioner will be entitled to renew his request for asylum." The court found Chun controlling. According to the district court, Chun held that all asylum applicants must be given a hearing regardless of their status. The court noted that granting the petition would not be "a futile exercise" in light of the "significant difference in procedure and level of review, depending upon whether the summary exclusion or asylum procedures are followed." This appeal followed.
 
 DISCUSSION
 
 8
 In 1952, Congress enacted section 235(c),[5] to turn back aliens who pose "a menace to this Nation's security," Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 219, 73 S.Ct. 625, 633, 97 L.Ed. 956 (1953) (Jackson, J., dissenting). Under section 235(c) and the accompanying regulation, 8 C.F.R. Sec. 235.8 (1985), when an INS official concludes that an alien may be excludable under paragraphs (27), (28), or (29) of section 212(a) of the Act, 8 U.S.C. Sec. 1182(a), no proceedings are to be held until after the case is reported to the Regional Commissioner together with such statements of information that the alien desires to submit. Section 212(a), in turn, lists classes of excludable aliens. The class most relevant to this case is described in paragraph (27) as
 
 
 9
 [a]liens who the consular officer or the Attorney General knows or has reason to believe seek to enter the United States solely, principally, or incidentally to engage in activities which would be prejudicial to the public interest, or endanger the welfare, safety, or security of the United States.
 
 
 10
 18 U.S.C. Sec. 1182(a)(27). Paragraphs (28) and (29) apply to aliens who are members of or affiliated with "subversive" organizations and aliens who are involved in espionage, respectively. Section 235(c) also provides that if the Regional Commissioner is satisfied that the alien is excludable under any of these paragraphs on the basis of confidential information the disclosure of which would be prejudicial to the public interest, safety, or security, "he may in his discretion order such alien to be excluded and deported without any inquiry or further inquiry by a special inquiry officer." The Regional Commissioner may also determine that the alien deserves a full exclusion hearing.
 
 
 11
 Exclusion under section 235(c) is subject to review--albeit a limited one--on habeas corpus. See El-Werfalli v. Smith, 547 F.Supp. 152, 153 (S.D.N.Y.1982). Relying on the Supreme Court's interpretation of review for exclusion pursuant to section 212(a)(28) in Kleindienst v. Mandel, 408 U.S. 753, 770, 92 S.Ct. 2576, 2585, 33 L.Ed.2d 683 (1972), in El-Werfalli Judge Sofaer stated that the "governing standard permits the Court to inquire as to the Government's reasons, but proscribes its probing into their wisdom or basis. If the Court finds that the Government acted on a facially legitimate and bona fide reason, its inquiry is complete." 547 F.Supp. at 153. As part of this review, the El-Werfalli court undertook an in camera examination of classified materials to determine the Government's reasons for exclusion. Id. at 154.
 
 
 12
 Twenty-eight years after section 235(c) was enacted, Congress passed the Refugee Act of 1980, establishing "for the first time a provision in federal law specifically relating to asylum" in order "to ensure a fair and workable asylum policy which is consistent with this country's tradition of welcoming the oppressed of other nations and with our obligations under international law." H.R.Rep. No. 608, 96th Cong., 1st Sess. 17 (1979). The Refugee Act brings federal statutory law into general agreement with this country's existing obligations under the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, T.I.A.S. No. 6577 ("UN Protocol"). See INS v. Stevic, 467 U.S. 407, ---- - ----, 104 S.Ct. 2489, 2492, 2494-97, 81 L.Ed.2d 321 (1984); Chun, 708 F.2d at 872. In pertinent part, the Refugee Act defines the term "refugee" as one who has a "well-founded fear of persecution" in his or her homeland, 8 U.S.C. Sec. 1101(a)(42).[6] The legislation does not construct a comprehensive asylum scheme. Instead, it states that
 
 
 13
 The Attorney General shall establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title.
 
 
 14
 Id. Sec. 1158(a) (emphasis added). In addition, Congress amended section 243 of the 1952 Act, providing that an alien shall not be deported to a country where the alien's "life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion." Id. Sec. 1253(h)(1). At the same time, under the Refugee Act, this mandatory withholding of deportation provision does not apply to certain limited categories of aliens, including situations in which "there are reasonable grounds for regarding the alien as a danger to the security of the United States." Id. Sec. 1253(h)(2)(D).[7] In other words, the principal asylum remedy--nondeportation or nonreturn to a threatening country--does not extend to all aliens and specifically not to those constituting a danger to our security.
 
 
 15
 The Attorney General has promulgated asylum regulations, which provide that the alien first apply for asylum with the District Director. 8 C.F.R. Sec. 208.8. The District Director must deny the request if "it is determined" that "[t]here are reasonable grounds for regarding the alien as a danger to the security of the United States," among other reasons, id. Sec. 208.8(f)(1)(vi).[8] Thus, security-danger aliens cannot receive asylum under the Refugee Act. Section 208.9 states that when an application for asylum is denied by the District Director, "the applicant may renew his/her request for asylum before an immigration judge in exclusion or deportation proceedings," where the alien can seek withholding of deportation under section 243(h). Finally, under section 208.10, the asylum regulations provide for the presentation of evidence before an immigration judge, including special non-record evidence pertaining to classified information.[9]
 
 
 16
 The parties agree that this court's analysis in Chun warrants close examination in resolving this case. Chun involved the quest for political asylum of two stowaways who had illegally left the People's Republic of China. On arriving in the United States, both men filed requests for political asylum, alleging that they had a well-founded fear of persecution in China. The District Director denied their requests, concluding that neither qualified as a refugee under 8 U.S.C. Sec. 1101(a)(42)(A). A federal district court denied the men's habeas petitions, holding that in light of their stowaway status, both men could be summarily excluded without the benefit of a hearing before an immigration judge. Chun, 708 F.2d at 870-72.
 
 
 17
 This court reversed. After reviewing the statutory and regulatory scheme, id. at 872-73, we rejected the Government's argument that "stowaways are not entitled to procedures provided other excludable aliens." Id. at 873. First, the INS asylum regulations did not support the Government's position. We found that the regulations did not distinguish between stowaways and other aliens, and declined "to read into these regulations a qualifier: aliens whose asylum applications are denied may reassert their asylum claim in an exclusion hearing only if they are entitled to such a hearing under other provisions of the Act." Id. at 874 (emphasis in original). Second, we rejected the Government's argument that the asylum hearing provisions under the Refugee Act could not be harmonized with the provision requiring summary exclusion of stowaways, 8 U.S.C. Sec. 1323(d). We concluded:
 
 
 18
 Despite the fact that Chun and Shan are stowaways, their procedural rights as asylum applicants derive from the Refugee Act of 1980. Section 1323(d) is a specific provision detailing the treatment afforded alien stowaways. This provision must be read in light of Sec. 1182 which defines "general classes" of "[e]xcludable aliens." Although Sec. 1182(a)(18) lists "[a]liens who are stowaways" as an excludable class, Sec. 1182(a) contains a proviso stating that its definitions are applicable "[e]xcept as otherwise provided in this chapter." The Refugee Act limits the effect of Sec. 1323(d) by "otherwise provid[ing]" that aliens applying for asylum may do so "irrespective of ... status." 8 U.S.C. Sec. 1158(a). Whatever procedural limitations Sec. 1323(d) might impose in the absence of Sec. 1158, we hold that these limitations are not applicable in the asylum context to the extent and only to the extent that an asylum determination is involved.
 
 
 19
 Id. at 874-75 (emphasis in original). Third, we were unconvinced by the agency's policy arguments in support of its position. Id. at 875-76. Finally, we saw constitutional support for our construction, noting that "a refugee who has a 'well-founded fear of persecution' in his homeland has a protectable interest recognized by both treaty and statute, and his interest in not being returned may well enjoy some due process protection not available to an alien claiming only admission." Id. at 877 (footnotes omitted). Balancing the "severity of harm to the erroneously excluded asylee" against "the administrative burden of providing an asylum hearing," we indicated the propriety of requiring "a hearing before an immigration judge to determine whether applicants for asylum are, in fact, refugees within the meaning of the Act." Id.
 
 
 20
 Although the context here is somewhat different, the resolution of this case requires applying the Chun analysis to harmonize the asylum provisions and section 235(c). Chun made clear that an asylum applicant cannot be denied an administrative hearing simply because the Act does not provide for an exclusion or deportation hearing. Nevertheless, the Government quite correctly points out that Chun is distinguishable by noting that, under 8 C.F.R. Sec. 208.8, the asylum provisions expressly bar asylum for security risks but not stowaways. Although the asylum provisions and section 235(c) could be harmonized in support of Azzouka's position, to do so would require straining the statutes through too fine a mesh.
 
 
 21
 The Government would have section 235(c) guide our interpretation of the national security exception for asylum. Thus, according to the Government, the District Director correctly relied on the Regional Commissioner's determination of summary excludability in finding that Azzouka was not entitled to asylum. It is true that the language of the two provisions is similar, but it is not the same. Section 235(c), which refers to section 212(a)(27), covers aliens who "enter the United States solely, principally, or incidentally to engage in activities which would be prejudicial to the public interest, or endanger the welfare, safety, or security of the United States," while the asylum provisions exclude aliens who are "a danger to the security of the United States." See Ellis v. Ferro, 549 F.Supp. 428, 434 (W.D.N.Y.1982).[10]
 
 
 22
 At oral argument, the Government conceded that section 212(a)(27) was broader than section 243(h)(2)(D). Moreover, the two provisions were enacted at different times, and we have failed to uncover any evidence going either way on the question whether Congress intended the provisions to be interpreted in the same way. It is true, as Chun teaches, 708 F.2d at 874, that the exclusion provisions and the asylum provisions outline separate procedures with different goals. Nevertheless, we think the statutes may be read in pari materia without making section 243(h)(2)(D) surplusage. We need not find that section 243(h) has no applicability to any alien once the section 235(c) trigger is pulled. All we need decide is that if the Regional Commissioner has reasonable grounds for regarding an alien as a danger to the security of the United States, he not only may be excluded as an undesirable alien but also is not entitled to an asylum hearing.
 
 
 23
 We find that the Regional Commissioner is the appropriate official to make the national security determination and not the immigration judge for three reasons. First, in Chun we said explicitly that the asylum hearing would be limited "to the extent and only to the extent that an asylum determination is involved," 708 F.2d at 875, that the alien would get "a hearing limited to the asylum claim," id. at 876, and "limited solely to the issue of asylum eligibility," id. A fair reading of this language is that the asylum hearing should determine only whether an alien is a refugee within the meaning of section 1101(a)(42); i.e., does he have a well-founded fear of persecution? The determination as to whether he falls under one of the asylum exclusion categories is made outside the asylum process itself.
 
 
 24
 Second, it is difficult to believe that Congress intended sub silentio to amend the statutes regarding the summary exclusion of aliens threatening national security by providing a new asylum hearing in which the security issue could be aired. This reasoning is not inconsistent with Chun because Congress clearly intended to prevent security threats, unlike stowaways, from receiving asylum.
 
 
 25
 Third, sections 243(b)(2) and 235(c) both give the authority to determine security threats to the Attorney General. Under the regulations, the section 235(c) determination is delegated to the Regional Commissioner. The asylum procedure regulations state that the District Director must refuse asylum if "it is determined" that the alien is a security threat. Without reading too much into the statute or regulations, this language appears to contemplate a single determination within the INS and that by the Regional Commissioner.
 
 
 26
 As an alien who is a threat to the national security is disentitled to the substantive right of asylum, he is not entitled to the asylum hearing. We focused on this distinction in Chun by saying "[s]towaway status is not one of the reasons for denying an asylum application listed in the Federal Register notice or the regulations." 708 F.2d at 875 n. 19 (emphasis in original).[11]
 
 
 27
 Although we hold that an alien has no right to an asylum hearing under the Refugee Act or Chun if the Regional Commissioner determines, under the procedures of section 235(c), that he is a danger to the national security, we note that no such determination as to Azzouka has been made. As the Government conceded, section 212(a)(27) is broader than section 243(h)(2)(D) or 8 C.F.R. Sec. 208.8(f)(1)(vi). The Regional Commissioner's Sec. 235(c) decision sheds no light on the particular basis for excluding Azzouka. In pertinent part it states only that "it is concluded that the alien is inadmissible to the United States pursuant to Section 212(a)(27) of the Act." The District Director relied squarely and without any elaboration on this determination in rejecting Azzouka's asylum application.
 
 
 28
 Because it is unclear from the record whether Azzouka was excluded as a danger to the security of the United States, it is necessary that this action be remanded to the district court with instructions to remand to the INS for an explicit finding under Sec. 235(c) procedures as to whether Azzouka presents a danger to the security of the United States. If he does not, and if he does not fall under any of the other exclusions of Sec. 243(h)(2), then, under Chun, Azzouka is entitled to a hearing on his asylum petition. If the INS determines that Azzouka is a danger to the security of the United States, he may challenge that determination in the district court under the procedures and standards applied in El-Werfalli. Cf. Burrafato v. United States Department of State, 523 F.2d 554, 556 (2d Cir.1975), cert. denied, 424 U.S. 910, 96 S.Ct. 1105, 47 L.Ed.2d 313 (1976); NGO Committee on Disarmament v. Haig, 82 Civ. 3636 (S.D.N.Y. June 10, 1982), aff'd mem., 697 F.2d 294 (2d Cir.1982).
 
 
 29
 We reject the Government's contention that Azzouka conceded that he was in fact a danger to the national security by failing to challenge the section 235(c) determination in this habeas proceeding. First, on its face, the exclusion determination did not state that Azzouka presented a danger to the national security. Second, Azzouka's reason for filing this habeas petition was to seek a determination of his right to an asylum hearing, and not to challenge the findings of the Regional Commissioner. Although we agree that it would be far better to litigate these several issues in one proceeding, we refuse to penalize petitioner when, as here, the INS has failed to make the specific findings that would enable either the petitioner, the district court, or us to know whether he is entitled to an asylum hearing.
 
 
 30
 Reversed and remanded.
 
 
 31
 FRIENDLY, Circuit Judge, concurring in the result in part and dissenting in part:
 
 
 32
 I agree with the majority in reversing the decision of the district court, understandable as that decision was in the light of Yiu Sing Chun v. Sava, 708 F.2d 869 (2 Cir.1983). Were it not for Chun, a few sentences would suffice to reach the conclusion at which the majority's lengthy analysis has arrived. I concur only in the result because, with all respect, I have serious doubts whether Chun was rightly decided and believe we should reconsider it as the Government has asked us to do in the event we felt compelled to apply it here, rather than make what seems to me an unconvincing attempt to distinguish it.
 
 
 33
 Without going into detail, I cannot accept what appears to be the basic assumption of Chun, namely, that a stowaway who has already had the opportunity to apply for asylum with the District Director under 8 C.F.R. Sec. 208.1 to .8, is entitled, under 8 C.F.R. Sec. 208.9, to renew his asylum request "before an immigration judge in exclusion or deportation proceedings," when such proceedings with respect to stowaways are banned by 8 U.S.C. Sec. 1323(d). While the result of today's decision avoids extending Chun to security risk cases, I would have preferred to make a fresh start, including en banc procedures if these proved to be necessary. However, some other court of appeals will doubtless have an opportunity to decide the point determined by us in Chun in light of the decision of the Board of Immigration Appeals not to consider Chun as a controlling precedent outside the Second Circuit. See In re Waldei, Interim Decision No. 2981, at 6 (BIA, Oct. 30, 1984).
 
 
 34
 The point of my dissent is as follows: The majority opinion instructs the district court to remand to the INS for an explicit finding under Sec. 235(c) procedures as to whether Azzouka presents a danger to the security of the United States. This implies that the remand shall be to the Regional Commissioner rather than the District Director. I think that it should be to the latter and that no reference should be made to Sec. 235(c). The only defect in the INS proceedings was that the District Director in the asylum proceeding relied on the Regional Commissioner's finding, under the summary exclusion procedures of Sec. 235(c), that Azzouka fell within the broader language of Sec. 212(a)(27),[1] as conclusive on Azzouka's being "a danger to the security of the United States," and thus improperly held that he was deprived of discretion to grant asylum under 8 C.F.R. Sec. 208.8(f)(1)(vi). While this may be a reason for reopening the asylum proceeding before the District Director, despite the provision in 8 C.F.R. Sec. 208.8(c) that no appeal shall lie from his decision, see Garcia v. Smith, 674 F.2d 838 (11 Cir.) (seemingly holding that district court has jurisdiction to review, on habeas corpus under 8 U.S.C. Sec. 1105a(b), the District Director's decision to deny asylum to alien stowaway), rehearing denied & opinion modified, 680 F.2d 1327 (1982), I see no basis for requiring further proceedings before the Regional Commissioner under Sec. 235(c) when he has already properly discharged his duties under that provision.
 
 
 
 [1]
 Section 235(c) provides:
 Any alien (including an alien crewman) who may appear to the examining immigration officer or to the special inquiry officer during the examination before either of such officers to be excludable under paragraphs (27), (28), or (29) of section 1182(a) of this title shall be temporarily excluded, and no further inquiry by a special inquiry officer shall be conducted until after the case is reported to the Attorney General together with any such written statement and accompanying information, if any, as the alien or his representative may desire to submit in connection therewith and such an inquiry or further inquiry is directed by the Attorney General. If the Attorney General is satisfied that the alien is excludable under any of such paragraphs on the basis of information of a confidential nature, the disclosure of which the Attorney General, in the exercise of his discretion, and after consultation with the appropriate security agencies of the Government, concludes would be prejudicial to the public interest, safety, or security, he may in his discretion order such alien to be excluded and deported without any inquiry or further inquiry by a special inquiry officer. Nothing in this subsection shall be regarded as requiring an inquiry before a special inquiry officer in the case of an alien crewman.
 
 
 [2]
 Section 235(c) refers to the authority of the Attorney General, but that authority has been delegated by regulation to the Regional Commissioner. See 8 C.F.R. Sec. 235.8(b) (1985)
 
 
 [3]
 More specifically, Azzouka claims that his employment with the PLO was "benign" and that he "became disenchanted with the means of action advocated by that organization." He also alleges that he asked permission to leave the PLO but was threatened with harsh treatment for leaving his post. Finally, he notes that he was once arrested in Jordan, after the 1967 Israeli annexation of the West Bank, for "making favorable remarks about the quality of life in Israel."
 
 
 [4]
 Azzouka's present counsel advises that he usually represents indigent criminal defendants in his capacity as a clinical professor at New York University School of Law, that counsel was assigned to Azzouka when federal prosecutors brought criminal charges against Azzouka, and for several months, counsel sought to procure immigration counsel without success. He further states that he decided to represent Azzouka in the immigration proceedings even though he and his students had little or no prior experience with immigration law
 
 
 [5]
 The genesis of section 235(c) was the Passport Act of 1918, ch. 81, Sec. 1, 40 Stat. 559, as amended by the Passport Act of 1941, ch. 210, Sec. 1, 55 Stat. 252, which authorized the Attorney General to deny entry to aliens whose "entry would be prejudicial to the interests of the United States." See Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 210-11, 73 S.Ct. 625, 628, 97 L.Ed. 956 (1953). In Mezei, the Supreme Court, without reviewing the bases for the Attorney General's decision, upheld the exclusion of an alien who allegedly had lived in the United States for 25 years before visiting his dying mother in Rumania for 19 months
 
 
 [6]
 The definition in full reads:
 The term "refugee" means (A) any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion, or (B) in such special circumstances as the President after appropriate consultation (as defined in section 1157(e) of this title) may specify, any person who is within the country of such person's nationality or, in the case of a person having no nationality, within the country in which such person is habitually residing, and who is persecuted or who has a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. The term "refugee" does not include any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion.
 
 
 [7]
 Section 243(h) reads in full:
 Withholding of deportation or return
 (1) The Attorney General shall not deport or return any alien (other than an alien described in section 1251(a)(19) of this title) to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.
 (2) Paragraph (1) shall not apply to any alien if the Attorney General determines that--
 (A) the alien ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion;
 (B) the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States;
 (C) there are serious reasons for considering that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States; or
 (D) there are reasonable grounds for regarding the alien as a danger to the security of the United States.
 8 U.S.C. Sec. 1253(h) (1982).
 
 
 [8]
 Section 208.8(f)(1) reads:
 The district director shall deny a request for asylum or extension of asylum status if it is determined that the alien:
 (i) Is not a refugee within the meaning of section 101(a)(42) of the Act;
 (ii) Has been firmly resettled in a foreign country;
 (iii) That the alien [sic ] ordered, incited, assisted or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular group, or political opinion;
 (iv) The alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States;
 (v) There are serious reasons for considering that the alien has committed a serious non-political crime outside the United States prior to the arrival of the alien in the United States; or
 (vi) There are reasonable grounds for regarding the alien as a danger to the security of the United States.
 
 
 [8]
 C.F.R. Sec. 208.8(f)(1) (1935)
 
 
 [9]
 The regulations concerning non-record evidence provide:
 (c) Record and non-record evidence. Both the applicant and the Service may present evidence for the record in the exclusion or deportation proceedings. Additionally, the Service may present non-record evidence to be considered by the immigration judge, provided the information is classified under Executive Order No. 12356. When the immigration judge receives non-record evidence, the applicant shall be informed as to whether the character of the evidence concerns political, social or other conditions in a specified country, or personally related to the applicant.
 (d) Disclosure of non-record evidence. The immigration judge may disclose to the asylum applicant the non-record evidence, or any part thereof, to the extent that he believes he can do so and still safeguard the information and its source. The applicant shall be provided opportunity to rebut any evidence so disclosed. A decision based in whole or in part on non-record evidence shall state that such evidence is material to the decision.
 
 
 [8]
 C.F.R. Sec. 208.10 (1985)
 
 
 [10]
 In Ellis, the district court, noting this distinction between Sec. 243(h)(2)(D) and Sec. 212(a)(27), stated that an asylum applicant summarily excluded by the Regional Commissioner was entitled to a hearing before the court with respect to his asylum claim at which time a determination would be made as to whether the Regional Commissioner excluded petitioner as a "danger to the security of the United States" or under some other part of Sec. 212(a)(27)
 
 
 [11]
 This decision is supported by the U.N. Protocol, supra. That Protocol provides that asylum can be denied to national security risks. Congress obviously had it in mind in adopting the Refugee Act. See supra at 8. Under Article 33.2 of the Convention, "[t]he benefit of [asylum protection] may not ... be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of the country in which he is ..."
 In fashioning a procedural mechanism by which a host country can make this determination of national security impact, the Convention specifically provides that certain due process procedural protections normally imposed do not apply "where compelling reasons of national security otherwise require ...":
 The expulsion of such a refugee shall be only in pursuance of a decision reached in accordance with due process of law. Except where compelling reasons of national security otherwise require, the refugee shall be allowed to submit evidence to clear himself, and to appeal to and be represented for the purpose before competent authority or a person or persons specially designated by the competent authority.
 Convention, Article 32.2 (emphasis added). See also S.Rep. No. 96-256, at 4, 14-15 (July 23, 1979), reprinted in 1980 U.S.Code Cong. & Ad.News 141 at 144, 154-55; H.Conf.Rep. No. 96-781, at 19-20 (Feb. 22, 1980), reprinted in id. at 160-61.
 
 
 [1]
 "Aliens who the consular office or the Attorney General knows or has reason to believe seek to enter the United States solely, principally, or incidentally to engage in activities which would be prejudicial to the public interest, or endanger the welfare, safety, or security of the United States[.]"