**DIA NAVIGATION CO., LTD., Plaintiff,**

v.

**Janet RENO, Attorney General; Chris Sale, Acting Commissioner, Immigration and Naturalization Service; James Pomeroy, District Director, Immigration and Naturalization Service, Defendants.**

Civ. A. No. 93–1366 (AJL).

United States District Court,
D. New Jersey.

Aug. 11, 1993.

Stephen H. Vengrow, Cichanowicz, Callan & Keane, New Providence, NJ, for plaintiff.

James B. Clark, III, Asst. U.S. Atty., Office of U.S. Atty., Newark, NJ, and Alexander H. Shapiro, Office of Immigration Litigation, Civ. Div., U.S. Dept. of Justice, Washington, DC, for defendants.

## OPINION

LECHNER, District Judge.

Currently before the court is the motion of plaintiff Dia Navigation Co., Ltd. ("Dia Navigation") for summary judgment, pursuant to Fed.R.Civ.P. 56, and the cross-motion of defendants Janet Reno, Attorney General (the "Attorney General"), Chris Sale, Acting Commissioner of the Immigration and Natu-

ralization Service (the "INS"), and James Pomeroy, District Director of the INS (collectively, the "Government"), to dismiss the complaint (the "Complaint"), filed 30 March 1993, for failure to state a claim for which relief can be granted, pursuant to Fed. R.Civ.P. 12(b)(6).[1]

For the reasons that follow, the cross-motion of the Government to dismiss the Complaint is construed as a motion for summary judgment and is granted; the motion of Dia Navigation for summary judgment is denied.

### Facts

Dia Navigation, a Cyprus corporation, is the owner of the M/V European Senator (the "Senator"), which is a time-chartered ocean liner transporting commercial cargo between various ports in Europe and ports on the East Coast of the United States. Dia 12G Statement, ¶ 1; Complaint, ¶¶ 5, 8. One of the United States ports used by the Senator is the Port of Newark, New Jersey ("Port Newark"). Dia 12G Statement, ¶ 1.

On 13 February 1993, while at sea, four Romanian stowaways (the "Stowaways") were discovered aboard the Senator.[2] Complaint, ¶ 10. The stowaways lacked proper documentation to enter the United States and, accordingly, were secured upon the Sen-

ator. Id. On 21 February 1992, upon arrival of the Senator at Port Newark, the Stowaways were presented to an INS inspector (the "INS Inspector"). Dia 12G Statement, ¶ 2; Complaint, ¶ 10. At that point, all four Stowaways requested political asylum from the INS Inspector. Dia 12G Statement, ¶ 3; Complaint, ¶ 10.

Upon determination by the INS Inspector that a legitimate political asylum question was raised by the Stowaways, the charterer of the Senator, Senator Linie GmbH & Co. KG (the "Charterer"), was presented with a Form I-259 ("Form I-259") by the INS Inspector.[3] Dia 12G Statement, ¶ 3; see also Complaint, Ex. A (copy of Form I-259). Pursuant to Form I-259, Dia Navigation was required to detain and pay for the Stowaways throughout the political asylum process. Dia 12G Statement, ¶ 4. Form I-259 directed:

> Pursuant to the provisions of the Immigration and Nationality Act [(the "INA")], and the Regulations issued by the Attorney General thereunder, you are directed to—Detain [the stowaways] on board.... CARRIER IS RESPONSIBLE FOR THE DETENTION, TRANSPORTATION AND WELFARE OF THE ALIEN[S] UNTIL OTHERWISE INSTRUCTED BY US INS.

1. In connection with the motions before the court, Dia Navigation has submitted the following: Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment (the "Dia SJ Brief"); Plaintiff's Statement of Undisputed Material Facts (the "Dia 12G Statement"); Declaration of Stephen H. Vengrow (the "Vengrow Aff."); Affidavit of Nancy Nixon (the "Nixon Aff."); Reply to Defendants' Motion to Dismiss the Complaint for Failure to State a Cause of Action for Which Relief Can Be Granted (the "Dia 12(b)(6) Brief"); Letter to court, dated 23 July 1993, enclosing copy of INS Acting General Counsel legal opinion (the "INS General Counsel Opinion"), dated 11 January 1993; Memorandum in Support of A Court's Order to Require the INS to Reimburse Plaintiff for Detention Expenses of a Stowaway Who has Applied for Political Asylum (the "Dia Supplemental Brief").

In connection with the motions before the court, the Government has submitted the following: Brief In Support of Defendant's Motion to Dismiss Complaint for Failure to State a Cause of Action for Which Relief Can Be Granted (the "Government 12(b)(6) Brief"); Defendant's Re-

ply Brief in Opposition to Plaintiff's Motion for Summary Judgment (the "Government SJ Brief"); Defendants' Supplemental Memorandum In Support of Defendant's Motion to Dismiss.

Oral argument was held on 23 July 1993. See Transcript of Proceedings of 23 July 1993 (the "23 July 1993 Tr.").

2. According to Dia Navigation, the fall of communism has increased the problem of aliens from Eastern Europe attempting to stowaway aboard ocean liners bound for the United States. Complaint, ¶ 9. For this reason, Dia Navigation alleges the Senator implements various measures to prevent the boarding of stowaways, including twenty-four hour security guards while in port. Id. Moreover, prior the Senator's departure form European ports, it is alleged "the vessel officers and crew conduct[ed] an extensive search of the vessel for possible stowaways and illegal drugs." Id.; see also Nixon Aff., ¶ 5.

3. Form I-259 is entitled "Notice to Detain, Deport, Remove or Present Aliens." See Complaint, Ex. A (copy of Form I-259).

Complaint, Ex. A (upper case in original). On 21 February 1992, the INS ordered the Stowaways to be removed from the Senator and detained on-shore. Nixon Aff., ¶ 3.

In accordance with Form I–259, Dia Navigation paid for hotel rooms, three security guards to continually watch over the Stowaways,[4] a translator and such accessorial detention costs as medicine, food and the like. Dia 12G Statement, ¶ 4; Complaint, ¶ 12. The responsibility of Dia Navigation for the Stowaways lasted for fifty-four days, until the asylum claims of the Stowaways were resolved and two of the Stowaways were deported. Complaint, ¶ 12 & Ex. B (chronology of political asylum process for Stowaways). The total cost to Dia Navigation for detention of the Stowaways was $127,580.00. Dia 12G Statement, ¶ 5; *see also* Complaint, Ex. C (copies of paid invoices).

According to Dia Navigation, the INS policy is such that, had Dia Navigation refused to assume the detention costs of the Stowaways, the Senator would have been prevented from entry into or departure out of Port Newark. Dia 12G Statement, ¶ 6; Complaint, ¶ 13; Nixon Aff., ¶ 4. Dia Navigation now seeks a declaratory judgment that the INS policy requiring ocean carriers to (1) detain stowaways who have applied for political asylum and (2) be responsible for the detention costs and expenses for those stowaways is unlawful and void. Complaint, ¶ 1. Specifically, Dia Navigation seeks a judgment declaring:

(1) The Immigration User Fee Statute requires the INS to pay [from the User Fee Account] for the detention of stowaways who have applied for political asylum;

(2) The INS policy that requires ocean carriers to detain stowaways who have applied for political asylum is unlawful and void;

(3) The INS policy that requires ocean carriers to pay the detention expenses of stowaways who have applied for political asylum exceeds the statutory authority of the INS and thereby violates the Ad-

ministrative Procedure Act [(the "APA"), 5 U.S.C. § 551 *et seq.*];

(4) The INS policy that requires ocean carriers to detain stowaways who have applied for political asylum is arbitrary and capricious in violation of the APA;

(5) The INS policy that requires ocean carriers to detain and pay for the detention of stowaways who have applied for political asylum is invalid for failure to comply with the notice and comment procedures of the APA;

(6) Defendants are liable to [Dia Navigation] for all expenses that defendants unlawfully caused [Dia Navigation] to incur for the detention of stowaways.

Notice of Motion, filed 11 June 1993, at 1–2; *see also* Complaint, ¶ 51. Dia Navigation also seeks reimbursement for the costs it was required to expend on the Stowaways in this case. *Id.*

*Discussion*

A. *Motion of Government to Dismiss the Complaint*

1. *Construing 12(b)(6) Motion as a Motion for Summary Judgment*

Trial courts enjoy substantial procedural flexibility in handling Rule 12(b) motions. *Berardi v. Swanson Mem. Lodge No. 48 of Fraternal Order of Police*, 920 F.2d 198, 200 (3d Cir.1990) (citing *Land v. Dollar*, 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947)). Specifically, Fed.R.Civ.P. 12(b) provides:

> If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and the parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

---

**4.** According to Dia Navigation, the INS has issued standing instructions that "each [stowaway] must be placed under round the clock guard— with one guard per stowaway—at the expense of the vessel." Nixon Aff., ¶ 4.

*Id.; see also Jones v. Automobile Ins. Co.,* 917 F.2d 1528, 1531–32 (11th Cir.1990) ("[i]t is within judge's discretion to decide whether to consider matters outside of pleadings that are presented to the court"); *Allison on Behalf of General Motors Corp. v. General Motors Corp.,* 604 F.Supp. 1106, 1119 (D.Del.) (same), *aff'd,* 782 F.2d 1026 (3d Cir. 1985).

In this case, Dia Navigation has presented arguments and materials outside of the Complaint which, for the sake of completeness, must be considered in interpreting the INA and in reviewing the INS policy of requiring carriers to bear the detention costs for stowaways claiming political asylum. Accordingly, the motion to dismiss is treated as a motion for summary judgment.[5]

### 2. Standard of Summary Judgment Review

To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The present task is to determine whether disputed issues of fact exist, but a district court may not resolve factual disputes in a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *see also Desvi, Inc. v. Continental Ins. Co.,* 968 F.2d 307, 308 (3d Cir.1992) ("threshold inquiry is whether there are 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party'") (citations omitted); *Gray v. York Newspapers, Inc.,* 957 F.2d 1070, 1078 (3d Cir.1992) ("We apply the test ... (1) Is there no genuine issue of material fact and (2) is one party entitled to judgment as a matter of law?") (quotations omitted); *Hackman v. Valley Fair,* 932 F.2d 239, 241 (3d Cir.1991) ("summary judgment is inappropriate when a conflict of a material fact is present in the record"); *Nathanson v. Medical College of Pennsylvania,* 926 F.2d 1368, 1380 (3d Cir. 1991) (summary judgment may not be granted "if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed").

All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538 (1986); *Williams v. New Castle County,* 970 F.2d 1260, 1264 (3d Cir.1992); *Boyle v. Governor's Veterans Outreach & Assistance Center,* 925 F.2d 71, 75 (3d Cir.1991); *Weldon v. Kraft, Inc.,* 896 F.2d 793, 797 (3d Cir.1990); *Todaro v. Bowman,* 872 F.2d 43, 46 (3d Cir.1989). "Any 'unexplained gaps' in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment." *Ingersoll-Rand Fin. Corp. v. Anderson,* 921 F.2d 497, 502 (3d Cir.1990) (quoting *O'Donnell v. United States,* 891 F.2d 1079, 1082 (3d Cir.1989)).

Although the summary judgment hurdle is a difficult one to overcome, it is by no means

---

**5.** Generally, if the court considers either arguments other than those contained in the motion to dismiss or facts raised in submissions other than the pleadings, a party must be given "an adequate opportunity to respond." *Berardi,* 920 F.2d at 200 (reversing dismissal when plaintiff had no opportunity before dismissal to address independent substantive legal theory adopted by court); *see also Connor v. United States E.E.O.C.,* 736 F.Supp. 570, 572 (D.N.J.1990) ("[p]laintiff is not required to plead facts additional to those in the complaint to withstand motion to dismiss") (citing *Bogosian v. Gulf Oil Co.,* 561 F.2d 434, 446 (3d Cir.1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978)).

In this instance, neither party will be prejudiced by construing the Government's motion to dismiss as a motion for summary judgment without additional briefing. Because Dia Navigation has filed a motion for summary judgment in addition to opposing the Government's motion to dismiss, both parties have had an opportunity to fully brief the relevant matters and to submit additional documentation. Moreover, Dia Navigation's documents in support of its motion for summary judgment have been considered extensively in connection with the summary judgment decision in favor of the Government.

In addition, the Government filed an answer to the Complaint on 14 May 1993, but did not serve its motion to dismiss until 28 May 1993. Accordingly, pursuant to Fed.R.Civ.P. 12(b), the motion to dismiss is not timely and must be construed as a motion for summary judgment if it is to be considered at all. *See id.* (motion to dismiss "shall be made *before pleading*") (emphasis added).

insurmountable. As the Supreme Court has stated, once the party seeking summary judgment has pointed out to the court the absence of a genuine issue of material fact,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with *"specific facts showing that there is a genuine issue for trial."* Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."

*Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1356 (emphasis in original, citations and footnotes omitted). In other words, the inquiry involves determining " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Brown v. Grabowski,* 922 F.2d 1097, 1111 (3d Cir.1990) (quoting *Anderson,* 477 U.S. at 251–52, 106 S.Ct. at 2512), *cert. denied sub nom., Borough of Roselle v. Brown,* —— U.S. ——, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991); *see also Gray,* 957 F.2d at 1078 ("there is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party").

The Supreme Court elaborated on the summary judgment standard in *Anderson:* "If the evidence [submitted by a party opposing summary judgment] is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted). The Supreme Court went on to note in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986): "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Id.,* at 323–24, 106 S.Ct. at 2553 (footnote omitted); *see also Carlson v. Arnot–Ogden Memorial Hosp.,* 918 F.2d 411, 413 (3d Cir.1990) ("nonmoving party must adduce more than a mere scintilla of evidence in its favor"); *Maguire v. Hughes Aircraft Corp.,* 912 F.2d 67, 72 (3d Cir.1990)

(non-moving party may not rest upon mere allegations); *Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 657 (3d Cir.1990) (neither unsupported allegations in pleadings and memoranda of law nor conclusory allegations in affidavits will establish genuine issue of material fact); *Aronow Roofing Co. v. Gilbane Building Co.,* 902 F.2d 1127, 1128 (3d Cir.1990) ("summary judgment will be granted where the non-moving party fails to 'establish the existence' of an element essential to the case").

The dispute between the parties in the present case rests primarily upon conflicting interpretations of the INA and upon the resulting INS policy with regard to stowaways. Because the parties essentially agree on the facts relevant to this dispute, the case is a particularly appropriate candidate for summary judgment analysis. *Continental Ins. Co. v. Bodie,* 682 F.2d 436, 439 (3d Cir.1982); *United States v. 294 Various Gambling Devices,* 718 F.Supp. 1236, 1242 (W.D.Pa.1989); *see also Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir.) ("summary judgment proper where facts are undisputed"), *cert. denied,* 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985); *Peterson v. Lehigh Valley Dist. Council, etc.,* 676 F.2d 81, 84 (3d Cir.1982) ("[s]ummary judgment is a useful procedure when there is no dispute about critical facts and it serves to eliminate expense and delay of unnecessary trials"); *Crain v. Board of Police Comm'rs of Metro. Police Dep't,* 920 F.2d 1402, 1405–06 (8th Cir.1990) (when "unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate").

### 3. *The INA Statutory Scheme*

The INA provides that all aliens arriving in the United States are subject to examination and inspection by an INS inspector to determine whether they are permitted to enter the country. *See* 8 U.S.C. §§ 1224–25; 8 C.F.R. § 235.3. If, upon preliminary inspection, the INS inspector finds that an alien falls into an "excludable" category, the alien is generally subject to an exclusion hearing before a special inquiry officer, *i.e.* an immigration judge, who determines his or

her immigration status.[6] *See* 8 U.S.C. §§ 1225–26.

Section 212(a) of the INA, 8 U.S.C. § 1182(a), describes the categories of aliens considered to be "excludable" aliens. *See id.; see also Graham v. Immigration and Naturalization Serv.*, 998 F.2d 194, 195 (3d Cir. 1993). An alien is considered excludable, *inter alia*, if he or she lacks proper documentation, suffers from a communicable disease, has committed certain crimes, may be a security threat, may become a public charge or may be an illegal entrant or immigration violator. *See id.*, § 1182(a)(1)–(6). With regard to this final category, Section 212(a)(6)(D), 8 U.S.C. § 1182(a)(6)(D), specifically provides that "[a]ny alien who is a *stowaway* is excludable."[7] *Id.* (emphasis added).

Although stowaways are excludable aliens, stowaways are considered to be a "disfavored" category of aliens.[8] *See Yiu Sing Chun v. Sava*, 708 F.2d 869, 875 n. 21 (2d Cir.1983); *Fang–Sui Yau v. Gustafson*, 623 F.Supp. 1515, 1519, 1523 (C.D.Cal.1985); *Medina*, 589 F.Supp. at 1036. For this reason, Section 273(d) of the INA, 8 U.S.C. § 1323(d), provides that, once an alien is determined by the INS inspector to be a stowaway, the stowaway—unlike other classes of excludable aliens—has no right to an exclusion hearing by a special inquiry officer or to an appeal to the Attorney General.[9] *See id.; see also Yiu Sing*, 708 F.2d at 873 n. 16; *Fang–Sui*, 623 F.Supp. at 1517, 1519. This section provides in pertinent part:

> The provisions of section 1225 of th[e INA] for detention of aliens for examination before special inquiry officers and the right of appeal provided for in section 1226 of th[e INA] shall *not apply to* aliens who arrive as *stowaways* and no such alien shall be permitted to land in the United States, except temporarily for medical treatment, or pursuant to such regulations as the Attorney General may prescribe for the ultimate departure or removal or deportation of such alien from the United States.

8 U.S.C. § 1323(d) (emphasis added).

Prior to 1986, Section 233 of the INA, 8 U.S.C. § 1223, required commercial carriers to bear complete responsibility for the expenses incident to the inspection, examination, detention and hearing of excludable aliens. In 1986, however, Congress repealed Section 233 and introduced, in its place, the Immigration User Fee Statute (the "User Fee Statute"), Pub.L. No. 99–591, 100 Stat.

---

6. Section 235 of the INA, 8 U.S.C. § 1225 provides in pertinent part:

   Every alien ... who may not appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land shall be detained for further inquiry to be conducted by a special inquiry officer. *Id.* Moreover, Section 236 of the INA, 8 U.S.C. § 1226, provides in pertinent part:

   A special inquiry officer shall conduct proceedings under this section, administer oaths, present and receive evidence, and interrogate, examine and cross-examine the alien or witnesses. He shall have the authority in any case to determine whether an arriving alien who has been detained for further inquiry under Section 1225 of this title shall be allowed to enter or shall be excluded and deported. *Id.*

7. As discussed below, stowaways are "excluded," as well as excludable, aliens. *See infra* at pp. 367–368, 370.

8. As one court has stated:

   The legislative history behind the [INA] unequivocally establishes that Congress intended to assure that "undesirable aliens" would not gain admission into this country. [H.R.Rep. No. 1365, 82nd Cong., 2d Sess., *reprinted in* 1653, 1698]. As one means to accomplish its goal, Congress eliminated the Attorney General's discretionary authority to admit stowaways and instead excluded all stowaways absolutely. *Id.* at 1703. Congress intentionally afforded stowaways less protection when it denied them any hearing before a special inquiry officer. *Id.* at 1710.

   *Medina v. O'Neill*, 589 F.Supp. 1028, 1036 (S.D.Tex.1984), *reversed in part and vacated in part on other grounds*, 838 F.2d 800 (5th Cir. 1988).

9. As discussed above, *see supra* n. 6, most classes of excludable aliens are entitled to an exclusion hearing, 8 U.S.C. § 1226(a), with appeal to the Attorney General, *id.*, § 1226(b), and, ultimately, court review by way of a habeas corpus petition, *id.*, § 1105a(6). *See Yiu Sing*, 708 F.2d at 873 n. 16. INA section 1323(d), however, denies stowaways a hearing and the right to appeal from an exclusion order. *See* 8 U.S.C. § 1323(d).

3341–53 (codified as part of 8 U.S.C. § 1356(d)–(*l*)).

As both parties agree, the User Fee Statute shifts much of the financial burden for detaining excludable aliens from the commercial carrier to the INS.[10] *See* Government 12(b)(6) Brief at 3; Government SJ Brief at 2; Dia SJ Brief at 3. The User Fee Statute establishes a separate account at the United States Treasury, the "User Fee Account," funded by a five dollar surcharge on the tickets of international passengers and from civil fines collected by the INS from air and ocean carriers. *See* 8 U.S.C. § 1356(d), (h). The User Fee Statute further provides:

> The Secretary of the Treasury shall refund out of the Immigration User Fee Account to any appropriation the amount paid out of such appropriation for expenses incurred *by the Attorney General in ... providing detention and deportation services for excludable aliens* arriving on commercial aircraft and vessels.

*Id.,* § 1356(h)(2)(A)(v) (emphasis added).

In addition to excludable aliens, the INA has created a de facto category of aliens termed "excluded" aliens, meaning those aliens defined as excludable pursuant to 8 U.S.C. § 1182(a) and subject to immediate exclusion and deportation. *See* 8 U.S.C. § 1227(a)(1). Because stowaways are not entitled to the exclusion hearing granted to most excludable aliens, stowaways have been considered to be "automatically excluded" from admission to the United States. *See Medina,* 589 F.Supp. at 1030. Section 237(a)(1) of the INA, 8 U.S.C. § 1227(a)(1), provides in pertinent part that "[a]ny alien ... arriving in the United States who is

*excluded ...* shall be immediately deported." *Id.* (emphasis added).

Once an alien is deemed excluded, as opposed to merely excludable, the INA requires carriers to assume responsibility for the cost of detention. Section 237(a)(1) of the INA, 8 U.S.C. § 1227(a)(1), provides in pertinent part:

> [A]ny alien ... arriving in the United States who is *excluded* under this Act, shall be immediately deported ... unless the Attorney General, in an individual case, in his [or her] discretion, concludes that immediate deportation is not practicable or proper.... The *cost and maintenance including detention expenses* incident to detention of any such alien while he is being detained,[11] *shall be borne by the owner or owners of the vessel* or aircraft on which he arrived.[12]

*Id.* (emphasis added). In general, deportation must be to the country in which the excluded alien boarded the vessel and must be "on a vessel or aircraft owned by the same person who owns the vessel or aircraft on which the alien arrived in the United States." *Id.,* § 1227(a), (c).

Finally, regardless of whether an alien is classified as excluded or as merely excludable, the INA, as amended by the Refugee Act of 1980 (the "Refugee Act"),[13] Pub.L. 96–212, 94 Stat. 109 (codified at 8 U.S.C. § 1157(a), *et seq.*), permits an alien to seek political asylum in the United States and to have his or her deportation stayed. Section 515 of the INA, 8 U.S.C. § 1158(a), provides:

> "[A]n alien physically present in the United States or at a land border or port of entry, *irrespective of such alien's status,* [may] apply for asylum and ... may be

---

**10.** In its own regulations, the INS has recognized that the User Fee Statute "[p]laces responsibility for physical custody of excludable aliens pursuant to former Section 233 of the [INA] ... on the INS." 53 Fed.Reg. 1791 (1988) (codified at 8 C.F.R. §§ 232–33, 235, 237–39, 280, 299). (proposed 22 Jan. 1988).

**11.** Stowaways usually are detained on board the carrying vessel. *Medina v. O'Neill,* 838 F.2d 800, 801 (5th Cir.1988) (citing 8 U.S.C. § 1323(d)).

**12.** Under certain circumstances, 8 U.S.C. § 1323(d) also provides for payment by carriers

of a $3,000 fine for stowaways. *See infra* n. 20 (quoting text of statute).

**13.** The Refugee Act was passed in order to bring United States refugee law into conformity with the United Nations Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, T.I.A.S. No. 6577. *See Canas–Segovia v. INS,* 902 F.2d 717, 722 (9th Cir.1990) (citing *INS v. Stevic,* 467 U.S. 407, 421, 104 S.Ct. 2489, 2496, 81 L.Ed.2d 321 (1984); *INS v. Cardoza–Fonseca,* 480 U.S. 421, 436–37, 107 S.Ct. 1207, 1215–16, 94 L.Ed.2d 434 (1987) (1984)), *vacated on other grounds,* —— U.S. ——, 112 S.Ct. 1152, 117 L.Ed.2d 401 (1992).

granted asylum . . . if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title."

*Id.* (emphasis added); *see also* 8 U.S.C. § 1253(h).

Uniformly, courts have held that stowaways, despite their excluded status, have a right to seek refugee status and political asylum in the United States, which includes the right to a hearing before an immigration judge.[14] *Garcia v. Smith,* 674 F.2d 838, 839–40 (11th Cir.1982); *Yiu Sing,* 708 F.2d at 874–77; *Fang–Sui,* 623 F.Supp. at 1521–26; *see also* 8 C.F.R. § 253.1(f) ("any . . . stowaway . . . is eligible to apply for asylum or withholding of deportation"). Because an alien who establishes asylum eligibility is protected from deportation to the country from which he or she is threatened, stowaways are not deported while such asylum applications are pending. *See Adebisi v. INS,* 952 F.2d 910, 913 (5th Cir.1992) ("application for asylum is also treated as a request for withholding of deportation"); *see also* 8 C.F.R. § 208.3(b); 8 C.F.R. § 253.1(f)(3).

### 3. *Who Must Bear the Cost of Detaining Stowaways Who Seek Political Asylum*

█ Because the Refugee Act grants stowaways the limited right to seek asylum and prevents carriers from deporting those stowaways, as required by 8 U.S.C. § 1158(a), the issue arises as to who must pay for the detention costs of stowaways while their asylum applications are pending. This issue appears to be one of first impression not just in this Circuit, but on a national basis as well.

Dia Navigation takes the position that the INS, pursuant to the User Fee Statute, must pay for the detention of stowaways. Complaint, ¶¶ 14–25. Dia Navigation contends:

By enacting the Immigration User Fee Statute, Congress intended to relieve air and ocean carriers of the financial responsibility for the detention of excludable aliens including stowaways. This intent is confirmed by the Conference Report for Continuing Appropriations for the Fiscal Year 1987. In that Report, the Committee of Conference summarizes Section 206 of the Appropriation Bill, *ergo,* the Immigration User Fee Statute, to wit:

Sec. 206: Provides language proposed by the Senate which would release scheduled passenger airlines and vessels from the responsibility to assume custody or financial responsibility for aliens who arrive by plane or commercial vessel in the U.S. without proper documentation.

Complaint, ¶ 18 (quoting H.R.Conf.Rep.No. 1005, 99th Cong., 2d Sess., 421 (1987) (to accompany H.R.Res. 738)).

Dia Navigation further contends:

In no uncertain terms, the Congressional intent for the User Fee Account was to change the existing INS policy to one that would "require the INS to assume, *in all cases,* all the custodial responsibility and financial responsibility in those cases where the transporting carrier 'demonstrated a good faith effort to detect admissibility.'"

*Id.,* ¶ 19 (quoting H.R.Rep. No. 669, 99th Cong., 2d Sess., 35 (1987) (emphasis added)); *see also* Dia SJ Brief at 3. In the alternative, Dia Navigation contends the carrier is liable for only $3,000 of such expenses. Dia Navigation argues:

The $3,000 fine for ocean carriers who permit the entry of a stowaway or who refuse to detain or deport a stowaway precludes the INS from imposing additional penalties in the form of detention expenses. . . . By imposing penalties (that is, requiring the payment of a stowaway's detention costs), in addition to the $3,000 fine expressly prescribed by Congress, the

---

14. In an effort to reconcile 8 U.S.C. § 1323(d), which provides that stowaways are *not* entitled to exclusion hearings, with 8 U.S.C. § 1158(a), which allows an alien to apply for asylum irrespective of the alien's status, courts have been careful to limit the right to a hearing *"solely* to the issue of asylum eligibility." *Yiu Sing,* 708 F.2d at 876 (emphasis added) ("[a]s stowaways, the petitioners are entitled to nothing more; as asylum seekers at our border, they are entitled to nothing less").

INS violates § 273(d) [and] acts contrary to law. . . .

Complaint, ¶ 36.

In contrast, the Government argues that "the [INA] makes clear that carriers are personally responsible for the detention of stowaways." Government SJ Brief at 1 (citing 8 U.S.C. § 1323(d)). The Government argues: "Since stowaways are automatically subject to exclusion from the United States without any recourse to an administrative hearing, it must follow that they belong to the category of excluded aliens for the purpose of defining the carrier's liability." *Id.* Moreover, while recognizing the User Fee Statute "alleviated a significant portion of the carrier's responsibilities" for detaining excludable aliens, the Government argues:

> Under the present scheme [of the INA], commercial carriers remain liable for the costs of detaining aliens who are "excluded", that is, subject to an order of exclusion, while the INS has taken over the detention costs of those aliens that are "excludable", or susceptible of exclusion, but not yet subject to an order of exclusion.

**15.** The interpretation of a statute, here the INA, by the INS, the agency charged with administering it, is entitled to substantial deference. *Yiu Sing*, 708 F.2d at 875 (citing *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565, 100 S.Ct. 790, 796, 63 L.Ed.2d 22 (1980)); *Fang–Sui*, 623 F.Supp. at 1522 (citing *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 274–75, 94 S.Ct. 1757, 1761–62, 40 L.Ed.2d 134 (1974); *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616, *reh'g denied*, 380 U.S. 989, 85 S.Ct. 1325, 14 L.Ed.2d 283 (1965)).

**16.** For that matter, the INA does not delineate any specific category of aliens as excluded aliens. The INA, however, does state:

> Any alien ... shall ... be deported if the alien is within one or more of the following classes of deportable aliens: (1) ... Any alien who at the time of entry or adjustment of status was within one or more of the classes of aliens excludable by the laws existing at such time is deportable.

8 U.S.C. § 1251(a).

**17.** In describing this change, a 1952 report of House of Representatives contains the following comment: "Stowaways are *excluded absolutely*, whereas, at present, the Attorney General has discretionary authority to admit stowaways." 1952 U.S.C.C.A.N. at 1724 (emphasis added); *see also Fang–Sui*, 623 F.Supp. at 1519.

*Id.* at 3 (citing 8 U.S.C. §§ 1227(a)(1), 1356(h)(2)(A)(v)).

The Government's interpretation of the INA appears to be accurate.[15] Under any reasonable interpretation of the INA, stowaways must be considered to be excluded aliens. Although the INA does not specifically describe stowaways as excluded aliens,[16] the statute implicitly recognizes that stowaways constitute a "disfavored" category of aliens by denying stowaways the right to an exclusion hearing before a special inquiry officer or any appeal to the Attorney General. 8 U.S.C. § 1323(d). As well, more than forty years ago, Congress removed the discretionary authority of the Attorney General to admit stowaways.[17] Accordingly, because stowaways have *no* administrative opportunity to challenge their exclusion from the United States, it is proper to consider stowaways to be excluded automatically by the INA from admission to the United States.[18] *See Medina*, 589 F.Supp. at 1030. As such, pursuant to 8 U.S.C. § 1227(a)(1), any detention expenses associated with stowaways must be borne by the carrier.[19]

**18.** Dia Navigation argues that the terms excludable and excluded "should be read 'as an ordinary, average or reasonable person would understand it.'" Dia SJ Brief at 11 (citing *SEC v. White & Co.*, 546 F.2d 789, 792 (8th Cir.1976)). Quoting Webster's New Collegiate Dictionary (1974 ed.), Dia Navigation defines excludable as "subject to exclusion" and excluded as "to shut; to bar from participation, consideration or inclusion." Dia SJ Brief at 11. Contrary to its intent, Dia Navigation's definitions support treatment of stowaways as excluded aliens. Because the INA denies an exclusion hearing to stowaways, and because the Attorney General has no discretionary authority to allow entry of stowaways into the United States, they cannot be considered to be anything but "bar[red] from participation, consideration or inclusion."

**19.** The parties engage in some discussion over when a stowaway is deemed excluded under the INA. *See* Government 12(b)(6) Brief at 6–7; Dia 12(b)(6) Brief at 3. This issue is insignificant. Whether a stowaway is deemed excluded *ab initio*, or not until an immigration inspector physically boards the vessel, determines the alien is a stowaway and issues a Form I–259, the point is that the stowaway is deemed excluded, and carrier responsibility for detention commences at a very early stage.

Dia Navigation's argument that the User Fee Statute requires the INS to assume responsibility for the detention costs of stowaways does not comport with the structure of the statute as a whole. For instance, notwithstanding the redistribution of detention expenses effected by Congress via the User Fee Statute, Congress left intact two significant statutory provisions.

First, Congress did not repeal or amend 8 U.S.C. § 1227(a)(1) which requires that any *excluded* alien be immediately deported and that the cost of maintenance, including any detention expenses, be borne by the carrier. *See id.* Second, Congress did not repeal or amend 8 U.S.C. § 1323(d), which, in addition to denying stowaways the right to a hearing before a special inquiry officer, also specifically sets forth a carrier's responsibilities with regard to stowaways. Pursuant to this section, a carrier is responsible for (1) detaining stowaways until they have been inspected by an immigration officer, (2) detaining stowaways after inspection, if ordered to do so by an immigration officer, and (3) deporting stowaways.[20] *See id.*

Because Congress failed to repeal or amend these provisions when, in 1986, it repealed 8 U.S.C. § 1223 and passed the User Fee Statute, Congress evidenced an intent to continue to treat stowaways as immediately excluded aliens, separate from the general category of excludable aliens. Moreover, the decision of Congress not to change these sections when, in other respects, it addressed the financial concerns of carriers, indicates an intent to maintain carrier responsibility for both the physical detention of stowaways and for the detention costs of excluded aliens in general and of stowaways in particular.[21]

To adopt Dia Navigation's argument would, in effect, improperly render sections 1227(a) and 1323(d) superfluous.[22] *See National Insulation Transp. Comm. v. ICC*, 683 F.2d 533, 537 (D.C.Cir.1982) (interpretation of statute is invalid if it renders any part of statute superfluous). As courts have recognized, a court must give "harmonious opera-

**20.** Section 1323(d) provides in pertinent part:

The owner, charterer, agent, consignee, commanding officer, or master of any vessel or aircraft arriving at the United States from any place outside thereof who fails to detain on board or at such other place as may be designated by an immigration officer any alien stowaway until such stowaway has been inspected by an immigration officer, or who fails to detain such stowaway ... after inspection if ordered to do so by an immigration officer, or who fails to deport such stowaway on the vessel or aircraft on which he arrived or on another vessel or aircraft at the expense of the vessel or aircraft on which he arrived ... shall pay to the Commissioner the sum of $3,000. 8 U.S.C. § 1323(d).

**21.** Dia Navigation argues that, because stowaways are defined by the INA as excludable aliens, they are necessarily covered by the User Fee Statute. Dia SJ Brief at 3–6, 11–12. This argument is without merit because it ignores the facts that (1) stowaways have traditionally been considered to be a disfavored category of aliens, immediately excluded with no right to an exclusion hearing and (2) Congress left intact the statutory provisions specifically applicable to stowaways and specifically requiring carriers to assume the detention costs of excluded aliens when it passed the User Fee Statute and repealed 8 U.S.C. § 1223. Moreover, relying on the definition of stowaways as "excludable" begs the issue. As the Government points out: "Every

alien ultimately excluded from the United States must first belong to an excludable class." Government 12(b)(6) Brief at 6–7 (citing 8 U.S.C. § 1182(a)).

**22.** Dia Navigation recognizes that "all words and provisions of a statute are intended to have meaning and are to be given effect." Dia SJ Brief at 11–12. This principle, however, works against Dia Navigation because the position advocated by it would render 8 U.S.C. §§ 1227(a) and 1323(d) without effect. In contrast, the position advocated by the Government—which requires the INS to assume detention costs for all excludable aliens *except for* stowaways—gives effect to both the User Fee Statute and the INA provisions applicable to excluded aliens and stowaways, 8 U.S.C. §§ 1227(a) and 1323(d).

Dia Navigation also argues: "Congress undoubtedly knew how to exclude certain categories of aliens from the operation of the [User Fee] Statute[, b]ut ... did not choose to exclude stowaways." Dia SJ Brief at 12. This argument is likewise without merit. Because the INA treats stowaways as excluded aliens and assigns the detention costs for excluded aliens to carriers, the INA already excluded stowaways from the operation of the User Fee Statute. Indeed, given that 8 U.S.C. §§ 1227(a) and 1323(d) pre-existed passage of the User Fee Statute, it is more appropriate to argue that, if Congress had intended a change in the treatment of stowaways, it would have repealed or amended those sections.

tion and effect to *all* statutory provisions if possible." *Yiu Sing,* 708 F.2d at 874 (citing *Watt v. Alaska,* 451 U.S. 259, 267, 101 S.Ct. 1673, 1678, 68 L.Ed.2d 80 (1981); *Morton v. Mancari,* 417 U.S. 535, 549–51, 94 S.Ct. 2474, 2482–83, 41 L.Ed.2d 290 (1974)) (emphasis added); *Fang–Sui,* 623 F.Supp. at 1523.

The Dia Navigation citation to legislative history is not persuasive. *See* Complaint, ¶¶ 18–19; Dia 12(b)(6) Brief at 4–5. First, as courts have indicated:

> The fundamental maxim of statutory interpretation is that the language of a statute is the best and most reliable index to its meaning, and where the language is clear and unequivocal, it is determinative of its construction.

*Fang–Sui,* 623 F.Supp. at 1521 (citing *Monte Vista Lodge v. Guardian Life Ins. Co.,* 384 F.2d 126, 128 (9th Cir.1967), *cert. denied,* 390 U.S. 950, 88 S.Ct. 1041, 19 L.Ed.2d 1142 (1968)). In this case, the statutory language is clear and unequivocal. Stowaways are automatically excluded from admission to the United States, 8 U.S.C. § 1323(d), and carriers are responsible for the detention expenses of excluded aliens, 8 U.S.C. § 1227. In addition, 8 U.S.C. § 1323(d) specifically envisions that detention responsibility for stowaways falls to carriers. *See id.*

Second, even if the legislative history cited by Dia Navigation is considered, that history does not unambiguously support Dia Navigation's position. The legislative reports cited by Dia Navigation express only a generalized concern over INS policy as it existed prior to enactment of the User Fee Statute. The reports do *not* interpret the User Fee Statute as passed or discuss its applicability to specific situations, such as stowaways. Moreover, the legislative reports explicitly refer only to aliens arriving "without proper documentation." *See supra* at p. 369. As the Government points out, aliens without proper documentation constitute a specific category of excludable aliens, separate and distinct from stowaways.[23] *Compare* 8 U.S.C. § 1182(a)(6) *with* 8 U.S.C.

§ 1182(a)(7); *see also National Insulation,* 683 F.2d at 537 (use of different terminology within body of legislation is evidence of intentional differentiation); *Lankford v. Law Enforcement Assist. Admin.,* 620 F.2d 35, 36 (4th Cir.1980) (same); *United States v. Wong Kim Bo,* 472 F.2d 720, 722 (5th Cir.1972) (same).

Accordingly, while Congress may have been generally concerned about requiring carriers to assume responsibility for the detention of all excludable aliens or, specifically, for the detention expenses of aliens without proper documentation, nothing in the legislative history unambiguously suggests that Congress intended to alter the long-standing treatment of the stowaways under the INA. In fact, as already discussed, the unaltered retention of 8 U.S.C. §§ 1227 and 1323(d) suggests otherwise.

The fact that stowaways, despite their excluded status, are permitted to apply for political asylum does not change this result. As discussed, the right to apply for political asylum is limited only to the issue of asylum eligibility and does not extend to questions of exclusion. *See supra* at n. 14. In other words, as the relevant INS regulations indicate, the asylum officer and the Board of Immigration Appeals address only the merits of a stowaway's asylum claim and do not address a stowaway's immigration status. *See* 8 C.F.R. §§ 208.4(b)(3), 253.1(f)(2), (4). Once asylum is deemed inappropriate, the stowaway is again able to be deported. *See id.,* § 208.22. Accordingly, even though a stowaway who has applied for refugee status may not initially be deported, such a stowaway remains an excluded alien for which the carrier is physically and financially responsible.

Dia Navigation has pointed to nothing in the text of the Refugee Act or in its legislative history that suggests carriers are to be relieved of the responsibility for detaining stowaways who have applied for political asy-

---

**23.** Nothing in the INA removes the right to an exclusion hearing from aliens without proper documentation.

lum. Similarly, Dia Navigation concedes that "the User Fee Statute does not specifically require the INS to detain stowaways who have applied for political asylum." Dia 12(b)(6) Brief at 4.

In contrast, as previously observed, the provisions left intact by Congress in the wake of the User Fee Statute indicate that no shift in stowaway responsibility was intended. Section 1323(d)(1) continues to provide that carriers are responsible for detaining stowaways after inspection, "*if ordered to do so by an immigration officer.*" *See* 8 U.S.C. § 1323(d)(1) (emphasis added).[24] Similarly, Section 1227(a)(1) recognizes that, "*when deportation is not . . . proper,*" as in the case of a stowaway requesting political asylum, immediate deportation of an excluded alien may be delayed.[25] *See* 8 U.S.C.

§ 1227(a)(1) (emphasis added). Thus, even when deportation is delayed,[26] Section 1227(a)(1) continues to require carriers to bear responsibility for the detention and accompanying cost of detention for those excluded aliens.[27] *See id.*

As Dia Navigation concedes, *see* 23 July 1993 Tr. at 21, carriers are unquestionably in the best position to prevent the entry of stowaways onto their ships. It is appropriate, therefore, to hold carriers responsible for the detention costs of those stowaways. Indeed, as one court has recognized:

> The goal of the [INA] was to prevent stowaways from landing illegally in the United States. [Congress'] perception of the problems attendant to stowaways resulted in legislation which punished carri-

**24.** Dia Navigation argues that the purpose of the User Fee Statute "would be pointless if it was to be read to mean merely that a source of funds would be created but only would be relied upon for reimbursement when the INS decided, at its option, to take custody of a stowaway who has applied for political asylum." Dia 12(b)(6) Brief at 5; Dia SJ Brief at 3. This argument is not persuasive because, as the Government suggests, stowaways make up only a small number of excludable aliens who attempt to enter the United States. *See* 8 U.S.C. § 1182(a) (listing categories of aliens who qualify as excludable). Accordingly, there appear to be significant numbers of excludable aliens for whom the INS is responsible and for which the User Fee Fund is utilized. *See* Government 12(b)(6) Brief at 3–4.

**25.** Although 8 U.S.C. § 1227(a) provides that the Attorney General may determine when immediate deportation is not proper, 8 U.S.C. § 1103 provides that the Attorney General may authorize any employee of the INS "to perform or exercise any of the powers, privileges or duties conferred or imposed by the [INA]." *Id.* Accordingly, 8 C.F.R. § 237.1 provides:
> The district director in charge of the port of arrival may stay the immediate deportation of an *excluded* alien pursuant to sections 237(a) and (d) of the [INA, 8 U.S.C. §§ 1227(a), (d) ] under such conditions as he may describe. *Id.* (emphasis added).

**26.** Dia Navigation argues:
> The fact that a stowaway who requests political asylum is allowed to proceed to a hearing on his/her asylum application is strong evidence that such stowaway's admissibility to the United States is put in doubt. Otherwise, the stowaway who files an application for political asylum would be immediately deported.

Dia 12(b)(6) Brief at 5 n. 1. This argument is without merit. In granting stowaways the right to seek political asylum, the Refugee Act was a humanitarian response "to the urgent needs of those subject to persecution in their homelands." *Yiu Sing*, 708 F.2d at 872. As discussed, the ability to seek asylum is unrelated to the question of a stowaway's excluded status. While the asylum request is pending, a stowaway remains an excluded alien such that, if the request for asylum is denied, the stowaway is subject to immediate deportation. If, however, a stowaway is found to qualify as a refugee, an exception is made and the Refugee Act, in keeping with its humanitarian purposes, overrides those otherwise relevant aspects of the INA which preclude admission of the stowaway to the United States.

**27.** Dia Navigation argues that 8 U.S.C. § 1227(a) "is completely immaterial to this case because the detention expenses at issue do not involve 'excluded' aliens who are subject to immediate deportation." Dia SJ Brief at 8. This argument misinterprets the statutory scheme. As discussed, an asylum hearing is *not* a substitute for an exclusion hearing and a stowaway's immigration status is not altered by the stowaway's request for political asylum. *See supra* at pp. 372–373. Stowaways remain excluded aliens, *subject to* immediate deportation, pending resolution of their request for political asylum. All that has occurred is that, for unrelated and limited purposes, deportation has been stayed. Not only does 8 U.S.C. § 1227(a) remain applicable in this situation, but that section specifically envisions that, in certain circumstances, immediate deportation may not be proper. *See id.* Section 1227(a) does not, however, shift responsibility for the detention costs of excluded aliens when deportation has been delayed.

ers for bringing stowaways into the United States.... [28]

*Fang–Sui,* 623 F.Supp. at 1523.

■ Finally, the argument of Dia Navigation that carrier liability is limited to $3,000 under 8 U.S.C. § 1323(d) is without merit. The statutory obligation of the carrier to pay for the detention of excluded aliens—in this case, stowaways—is contained in 8 U.S.C. § 1227. This section is entirely separate and distinct from 8 U.S.C. § 1323(d) which imposes an additional $3,000 administrative penalty on uncooperative carriers. Moreover, as the legislative history indicates, the two sections serve separate purposes. The assessment of detention costs for excluded aliens was designed to deter shippers "from bringing undesirable aliens to this country" and to encourage shippers to increase their security and screening procedures *prior to* embarkation. *See* 1952 U.S.C.C.A.N. at 1721. In contrast, the assessment of administrative penalties, such as the $3,000 penalty relating to stowaways, was intended "as an aid to enforcement" of the INA *after* the arrival in the United States of a vessel carrying aliens. *Id.* at 1723.

In sum, the INA unambiguously provides that carriers, not the INS, are responsible for the detention and the costs of detention of stowaways. Pursuant to 8 U.S.C. § 1323(d), stowaways are automatically excluded aliens and, pursuant to 8 U.S.C. § 1227, carriers must bear the costs of detention for excluded aliens. In addition, 8 U.S.C. § 1323(d) specifically envisions that carriers, when ordered by the INS, will be responsible for the detention of stowaways regardless of whether they are immediately deported.

*4. Whether the INS Policy on the Detention of Stowaways Violates INS Regulations*

Count Two of the Complaint alleges that "the INS policy on the detention of stowaways requesting political asylum violates its own regulations." Complaint at 13. In support of this contention, Dia Navigation cites 8 C.F.R. § 253.1(f)(1), (3), which provides:

If the alien is on a vessel or other conveyance and makes such fear [of political prosecution] known to an immigration inspector or other official making an examination on the conveyance, he shall be promptly removed from the conveyance. If the alien makes his fear known to an official while off such conveyance, he shall not be returned to the conveyance but shall be retained in or transferred to the custody of the [INS]....

Pending adjudication ... by the Asylum Officer, the applicant may be detained by the [INS], *or paroled into the custody of the ship's agent* or otherwise paroled in accordance with [8 C.F.R. §] 212.5 of this chapter and shall not be excluded or deported before a decision is rendered by the Asylum Officer on his asylum application.

8 C.F.R. § 253.1(f)(1), (3) (emphasis added); *see* Complaint, ¶ 39.

Based upon these sections, Dia Navigation contends that, when the INS paroles a stowaway requesting political asylum into the custody of the vessel owner, "it does so with the implied recognition that such stowaway's alien status is something other than one of automatic excludability." Complaint, ¶ 42. Dia Navigation thus argues that the INS contradicts its own regulations and abuses its discretion when it requires carriers to assume the detention costs of stowaways seek-

---

**28.** Dia Navigation argues that requiring carriers to pay for the detention costs of stowaways who request political asylum is unfair because, pursuant to 8 U.S.C. § 1323(c), liability is based upon "whether the ocean carrier has exercised reasonable diligence to prevent the stowaway from unlawfully coming to the United States to seek asylum." Dia SJ Motion at 17. Dia Navigation's reliance on 8 U.S.C. § 1323(c) is misplaced. Section 1323(c) indicates that penalties provided by 8 U.S.C. § 1323(a)—for transporting an alien who does not have a valid passport or has an expired visa—are not applicable if, prior to departure, the carrier "did not know, and could not have ascertained by the exercise of reasonable diligence, that the individual transported was an alien and that a valid passport or visa was required." *Id.,* § 1323(c). This section unambiguously does not apply to stowaways because, *inter alia,* stowaways remain undetected prior to departure. In addition, in the section immediately following 8 U.S.C. § 1323(c), Congress provided a separate section devoted to stowaways and to carrier responsibility for stowaways. *See id.,* § 1323(d).

ing political asylum. Dia Navigation also contends that, when the INS paroles a stowaway into the custody of a carrier, such parole is no different than when the INS directly paroles a stowaway under 8 U.S.C. § 1182(d)(5), 8 C.F.R. § 212.5. *Id.* According to Dia Navigation, "the concept of parole is wholly different from that of detention in that the former envisions liberty with certain reasonable conditions." *Id.*, ¶ 45. All of these contentions are without merit.

In general, the INA requires a carrier to detain a stowaway *"on board* or at such other place as may be designated by an immigration officer." 8 U.S.C. § 1323(d) (emphasis added). Nevertheless, 8 C.F.R. § 253.1(f)(3) provides a partial exception to this rule, in that it establishes three custody options pending adjudication of a stowaway's political asylum claim; such a stowaway may (1) be detained by the INS, (2) paroled into the custody of the ship's agent or (3) otherwise paroled in accordance with 8 C.F.R. § 212.5. 8 C.F.R. § 253.1(f)(3).

■ Because 8 C.F.R. § 253.1(f)(3) is discretionary in nature, the INS regulations permit the INS to choose the option which it considers to be most appropriate under a given set of circumstances. Contrary to Dia Navigation's suggestion, section 253.1(f)(3) does *not* require the INS to assume detention responsibility for stowaways.[29] Instead, the section merely provides that INS detention is an option, to be used when necessary to protect certain refugees. Because a stowaway seeking asylum may have travelled to the United States hidden on a vessel belonging to the country whose government he or she fears, it would not, as the Government suggests "be appropriate for the INS invariably to require that the alien remain in custody of the vessel's agent." Government SJ Brief at 11.

■ There is no merit to Dia Navigation's contention that, when a stowaway seeking asylum is paroled into the custody of a carrier, the stowaway's immigration status is "something other than automatic excludability." Complaint, ¶ 42. As several courts have repeatedly recognized, parole has *no effect* on an alien's immigration status. *See, e.g., Garcia–Mir v. Smith,* 766 F.2d 1478, 1484 (11th Cir.1985), *cert. denied sub nom., Marquez–Medina v. Meese,* 475 U.S. 1022, 106 S.Ct. 1213, 89 L.Ed.2d 325 (1986); *Jean v. Nelson,* 727 F.2d 957, 969 (11th Cir.1984) (citing *Leng May Ma v. Barber,* 357 U.S. 185, 190, 78 S.Ct. 1072, 1075, 2 L.Ed.2d 1246 (1958)), *aff'd,* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985); *see also Ordaz–Machado v. Rivkind,* 669 F.Supp. 1068, 1071 (S.D.Fla.1987) (despite "entry" into United States on parole, alien remained "classified as an excludable alien and ... subject to deportation"). Accordingly, because a stowaway remains an excluded alien, the carrier remains responsible for detention and detention costs of stowaways, pursuant to 8 U.S.C. § 1227, when the INS so requires pursuant to 8 C.F.R. § 253.1(f)(3).[30]

Dia Navigation has provided no support for the contention that parole into the custody of a carrier is the equivalent of a conditional release under 8 U.S.C. § 1182(d)(5)

---

29. In the Dia Navigation SJ Brief, rather than in the Complaint, Dia Navigation states that 8 C.F.R. § 235.3(b)-(d) requires the INS to assume custody of a stowaway pending resolution of an asylum claim. This argument is without merit. Section 235(b)-(d) relates to aliens without proper documents, with false documents or with documents but otherwise inadmissible. *See* 8 C.F.R. § 235.3(b)-(d). As previously discussed, such classes of aliens are separate and distinct from stowaways. *See supra* at p. 372. Moreover, contrary to Dia Navigation's suggestion, this is not a difference without a distinction. *See* Dia Navigation SJ Brief at 19. In contrast to the groups of excludable aliens discussed in 8 C.F.R. § 235.-3(b)-(d), the INA has singled out stowaways for disfavored treatment and leaves no doubt that stowaways are immediately excluded rather than merely excludable.

Dia Navigation also argues that parole into a carrier's custody will be effected only if INS facilities are unavailable. Dia SJ Brief at 21. Neither Section 253.1(f)(3) nor any of regulatory section imposes such a limitation on the discretion of the INS. *See* 8 C.F.R. § 253.1(f)(3).

30. Requiring carriers to assume detention responsibility for stowaways seeking political asylum, pursuant to 8 C.F.R. § 253.1(f)(3), is consistent with the INA, which leaves the decision of whether to detain or release a stowaway to INS discretion and provides that a carrier must detain the stowaway "if ordered to do so by an immigration officer." 8 U.S.C. § 1323(d).

and 8 C.F.R. § 212.5.[31] In fact, the structure and language of 8 C.F.R. § 253.1(f)(3) suggest otherwise. For instance, the interpretation urged by Dia Navigation ignores the fact that, in addition to providing for either INS custody or carrier custody of a stowaway requesting asylum, Section 253.-1(f)(3) provides that the INS, as a third option, may parole a stowaway pursuant to 8 C.F.R. § 212.5. If parole into the custody of a carrier was to be the equivalent of parole under 253.1(f)(3), it is clear two statutory sections were not necessary to achieve this singular purpose.

In addition, use of the word "custody," in connection with the phrase "paroled in the custody of the ship's agent," indicates some form of physical detention or control was intended by the regulation, rather than mere supervision over conditional release.[32] See Webster's New Collegiate Dictionary 318 (9th ed. 1986) (defining custody as "immediate charge and control"); Black's Law Dictionary 347 (5th ed. 1979) (custody is an "elastic [concept] and may mean actual imprisonment or physical detention or mere power, legal or

physical, of imprisoning or of taking manual possession").

■ Although the INS is bound by its own rules and is prohibited from any substantial deviation thereof, see Reuters Ltd. v. FCC, 781 F.2d 946, 951 (D.C.Cir.1986), no deviation from INS regulations has occurred by virtue of the INS policy requiring carriers to assume the detention responsibilities and costs of stowaways seeking political asylum. Such an interpretation is consistent not only with 8 C.F.R. § 253.1(f)(1), (3), but also with the relevant provisions of the INA.[33] See 8 U.S.C. §§ 1227, 1323(d).

5. *Whether INS Policy on Detention of Stowaways Violates the Administrative Procedure Act*

■ In Count Three, Dia Navigation argues that the INS policy of imposing detention expenses of stowaways on ocean carriers constitutes "arbitrary and capricious agency action," in violation of the APA; see Complaint, ¶ 17. According to Dia Navigation, it is unreasonable for carriers to bear the costs of stowaway detention when (1) those deten-

---

**31.** 8 U.S.C. § 1182(d)(5) provides in pertinent part:

> The Attorney General may ... in his [or her] discretion parole into the United States temporarily under such conditions as he [or she] may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States....

*Id.* Similarly, 8 C.F.R. § 212.5 lists numerous considerations and conditions to be considered in determining whether parole is appropriate, none of which support the conditional release of stowaways into the United States. *See id.*

**32.** As indicated previously, *see supra* at n. 30, this interpretation of 8 C.F.R. § 253.1(f)(3) is consistent with 8 U.S.C. § 1323(d) which requires a carrier to detain stowaways on board or at such other place as may be designated by an immigration officer. *See id.* Moreover, the conditional release urged by Dia Navigation is undercut by the fact that parole in the form of unconditional release is " 'granted only occasionally, in the case of rare and exigent circumstances, and only when it would plainly serve the public interest.' " *Ordaz–Machado*, 669 F.Supp. at 1070 (quoting *Amanullah v. Nelson*, 811 F.2d 1, 6 (1st Cir. 1987)).

**33.** Dia Navigation cites a section of the INS General Counsel Opinion entitled "The current asylum regulations contradict the statutory provi-

sions regarding carrier custody." *See* 23 July 1993 Tr. at 51–52; *see also* INS General Counsel Opinion at 6–7. This section, however, works against Dia Navigation. According to the INS General Counsel, 8 C.F.R. §§ 253.1(f)(1) and 253.1(f)(3) contradict 8 U.S.C. § 1323(d) to the extent that regulation requires a stowaway requesting asylum be retained in or transferred to INS, rather than carrier custody. The INS General Counsel states:

> By requiring that an alien stowaway requesting asylum be "retained in or transferred to" *Service* custody, the new regulation contradicts *the express requirement of section 273(d) of the INA that alien stowaways remain in the custody of the carrier* .... We recommend ... immediate steps to amend the language of the new regulations to make them conform to the statutory provisions. We suggest that 8 C.F.R. sections 253.1(f)(1) and (3) be amended to state that stowaway asylum applicants *"shall be detained by the carrier* pursuant to section 273(d) of the INA, or otherwise paroled...." *This language would ensure that stowaways who express a fear of remaining in carrier could be detained in a neutral facility and the carrier would remain liable for the stowaway's detention expenses.*

INS General Counsel Opinion at 7.

tion costs "are due to the decision of the United States Congress to provide undocumented aliens arriving by vessel with an opportunity to remain in the United States" and (2) the policy is in effect "regardless of the duration of the INS proceedings against aliens and regardless of whether the ocean carrier was powerless to prevent the alien's entry into the United States." *Id.,* ¶ 49.

Dia Navigation contends the imposition of stowaway detention expenses "constitutes irrational, unprincipled action and abuse of agency power." *Id.* (citing 5 U.S.C. § 706(2)(A)). Moreover, Dia Navigation contends the imposition of stowaway detention expenses violates the APA requirement that legislative or substantive rules be promulgated through the APA's notice and comment procedures. *Id.* (citing 5 U.S.C. §§ 553, 706(2)(D)). These contentions have no basis.

In *Chevron, U.S.A., Inc. v. National Resources Defense Counsel, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), *reh'g denied,* 468 U.S. 1227, 105 S.Ct. 28, 82 L.Ed.2d 921 (1984), the Supreme Court outlined the proper task in reviewing an administrative construction of a statute that the agency administers. First, the Court indicated a court must determine whether Congress "has directly spoken to the precise question at issue." *Id.,* at 842, 104 S.Ct. at 2781; *see also General Motors Corp. v. Ruckelshaus,* 742 F.2d 1561, 1567 (D.C.Cir. 1984), *cert. denied sub nom., General Motors Corp. v. Thomas,* 471 U.S. 1074, 105 S.Ct. 2153, 85 L.Ed.2d 509 (1985). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781.

If an administrative construction does not contravene clearly discernible legislative intent, the reviewing court cannot "simply impose its own construction on the statute." *Id.,* at 843, 104 S.Ct. at 2782. Instead, the question becomes whether the agency's construction was sufficiently "reasonable" to be accepted by a reviewing court. *Id.,* at 843–44 & n. 11, 104 S.Ct. at 2782 & n. 11 (citing *FEC v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981)); *General Motors,* 742 F.2d at 1567. As already discussed and as the Supreme Court has stated:

> [C]onsiderable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations "has been consistently followed by this Court whenever decision as to meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting matters subjected to agency regulations.... If this choice represents a reasonable accommodation of conflicting policies that were committed to the agencies' care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned."

*Id.,* 467 U.S. at 844–45, 104 S.Ct. at 2782–83 (quoting *United States v. Shimer,* 367 U.S. 374, 382–83, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)) (other citations omitted).

As discussed, the INA, by its plain language, requires carriers be responsible for the detention costs of excluded aliens, and hence of stowaways, pursuant to 8 U.S.C. §§ 1227 and 1323(d). Moreover, the fact that Congress, by passing the User Fee Statute and repealing 8 U.S.C. § 1223, chose to reassign responsibility for detaining other classes of excludable aliens, but did not repeal or amend 8 U.S.C. §§ 1227 and 1323(d), confirms this reading of the statute.

Because the intent of Congress is clear, and because the policy of the INS simply tracks the INA by treating stowaways as immediately excluded and by requiring carriers to assume responsibility for the detention costs of stowaways,[34] the INS policy does not

---

**34.** Form I–259 issued by the INS to carriers with stowaways merely tracks and re-iterates the requirements of the INA. Form I–259 directs:

Pursuant to the provisions of the [INA], and the Regulations issued by the Attorney General thereunder, you are directed to—Detain [the stowaways] on board.... CARRIER IS RE-

violate the APA. Moreover, even if it is accepted, *in arguendo*, that the intent of Congress with regard to stowaways who have requested political asylum is not clear, the INS reliance on 8 U.S.C. §§ 1227 and 1323(d) constitutes a sufficiently reasonable interpretation of the INA and of the intent of Congress.[35] In keeping with the deference accorded to administrative policy determinations stated in *Chevron*, the INS policy is neither arbitrary nor capricious.

■ There is also no basis for the contention that the INS was required to publish notice and comment procedures before requiring carriers to assume responsibility for stowaway detention. A policy that "simply states what the administrative agency thinks the statute means, and only 'reminds' affected parties of existing duties," is exempted by the APA from its notice and comment procedures. *General Motors*, 742 F.2d at 1565 & n. 6 (quoting *Citizens to Save Spencer County v. EPA*, 600 F.2d 844, 879 n. 171 (D.C.Cir. 1979)); *see also* 5 U.S.C. § 553(b)(A). In contrast, a "legislative" rule, which requires notice and comment, exists "if by its action

the agency intends to create new law, rights or duties." *General Motors*, 742 F.2d at 1565; *Jean*, 727 F.2d at 962. Because the policy of the INS is interpretative in nature and creates no rights or duties that are not already plainly stated in or reasonably inferred from the INA, no notice and comment were required for the INS to hold carriers responsible for the detention of stowaways requesting political asylum.

### 6. *Request for Damages by Dia Navigation*

■ Although neither the INA nor the APA is violated by the INS policy of requiring carriers, in some instances, to be responsible for the detention costs of stowaways seeking political asylum, the Government concedes that the INA and relevant INS regulations "do not establish specific conditions of carrier detention."[36] Government 12(b)(6) Brief at 12; *see also* 23 July 1993 Tr. at 3–4. Even assuming, *in arguendo*, that certain specific conditions imposed by the INS on Dia Navigation were arbitrary and capricious and caused Dia Navigation to in-

SPONSIBLE FOR THE DETENTION, TRANSPORTATION AND WELFARE OF THE ALIEN[S] UNTIL OTHERWISE INSTRUCTED BY US INS.
Complaint, Ex. A (upper case in original).

35. On the basis of the discussion in Sections A.3. and A.4 of this opinion, it is not accepted that, as contended by Dia Navigation, the INS policy "constitutes irrational, unprincipled action and abuse of agency power."

36. For instance, the Government concedes that "there is no explicit requirement that the carrier provide an armed guard," and suggests that a "precaution such as an armed guard may be necessary under certain circumstances in order for the carrier to fulfill its statutory obligations to present the alien for a hearing or deportation." *Id.* at 12–13. Nevertheless, in this case, Dia Navigation employed a twenty-four hour armed guard for each Stowaway because it claims it was required to do so by INS standing order.

At oral argument, the Government attorney, Alexander Shapiro, Esq. ("Shapiro") took the implausible position that, *whatever* the conditions or duration of detention imposed by the INA, a carrier cannot challenge those conditions as unreasonable. *See* 23 July 1993 Tr. at 8–18. For instance, the 23 July 1993 Tr. reads, in part:

COURT: Suppose the[e asylum] hearing doesn't occur for two years. By definition, that's reasonable?
SHAPIRO: Yes, your Honor.
COURT: Oh it is? I suppose five years is reasonable?
SHAPIRO: Yes, your Honor....
COURT: Ten years, would that be reasonable?
SHAPIRO: If necessary to hold the alien that long, yes....
COURT: Suppose the hearing just didn't occur for 60 days, but could have occurred within ten days, are the additional 50 days unreasonable?
SHAPIRO: No....
COURT: I'm asking you whether [carriers] have the right to challenge what the INS docs. You say no. The INS can do literally anything, take as much time as it wants, impose as many conditions as it wants and then the INS can say, this is reasonable and they're at a dead end. Is that what you're saying?
SHAPIRO: Essentially, yes, your Honor....
COURT: That just doesn't sound fair. You can have [an INS Inspector] who has a bad day and says, I want two guards on this guy 24 hours a day, I want him put in the Plaza, I want him given gourmet meals and you're telling me that that vessel owner can't say a thing about that, right?
SHAPIRO: Yes.
*Id.*, at 8–18, 42.

cur unreasonable or unwarranted expenses, the question arises whether Dia Navigation may seek reimbursement for those expenses under the APA.

The Supreme Court has stated that waivers of sovereign immunity are to be construed strictly. *Library of Congress v. Shaw,* 478 U.S. 310, 318, 106 S.Ct. 2957, 2963, 92 L.Ed.2d 250 (1986); *Hubbard v. Administrator, EPA,* 982 F.2d 531, 532 (D.C.Cir. 1992). Accordingly, a waiver of sovereign immunity cannot be found "unless Congress' intent is 'unequivocally expressed' in the relevant statute.'" *Hubbard,* 982 F.2d at 532 (quoting *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607, *reh'g denied,* 446 U.S. 992, 100 S.Ct. 2979, 64 L.Ed.2d 849 (1980)). For Dia Navigation to prevail on its claim for damages, it must demonstrate a "legislative intent ... so clear and explicit as to brook no reasonable doubt." *Id.,* at 532–33; *In re Perry,* 882 F.2d 534, 544 (1st Cir.1989).

In 1976, the APA was amended "to broaden the areas for judicial review of agency action by eliminating the defense of sovereign immunity" in certain cases. *Bowen v. Massachusetts,* 487 U.S. 879, 892, 108 S.Ct. 2722, 2731, 101 L.Ed.2d 749 (1988). Section 702 of the APA states:

> An action in a court of the United States seeking relief *other than money damages* and stating a claim than an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702. As explained by the Supreme Court, this section embodied Congressional intent not only that suits for damages be barred, but also that, with regard to equitable relief, "the time [had] come to eliminate the sovereign immunity defense in all equitable actions for specific relief against a Federal agency or officer acting in an official capacity." *Bowen,* 487 U.S. at 899, 108 S.Ct. at 2735 (citing H.R.Rep. No. 94–1656, 94th Cong., 2d Sess. at 9 (1976); S.Rep.No. 996, 94th Cong., 2d Sess. at 8 (1976)).

In *Bowen,* the Supreme Court re-emphasized the proposition that "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" 487 U.S. at 893, 108 S.Ct. at 2732. In describing money damages, the Court stated:

> [D]amages ... are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation.... The term "money damages" ... normally refers to a sum of money used as compensatory relief. Damages are given to the plaintiff to substitute for a suffered loss.

*Id.,* at 893–95, 108 S.Ct. at 2732. In contrast, the Court described specific relief as "not substitute remedies at all, but [an] attempt to give the plaintiff the very thing *to which he was entitled." Id.,* at 895, 108 S.Ct. at 2732–33 (emphasis added).

Although numerous cases have determined that monetary relief, under certain circumstances, constitutes equitable relief for the purposes of allowing recovery pursuant to 5 U.S.C. § 702, all of these cases have concerned some form of statutory entitlement to monetary relief. *See, e.g., Bowen,* 487 U.S. at 900, 108 S.Ct. at 2735 (suit to enforce section of Medicaid Act which requires Government to pay certain amounts to states for Medicaid services was proper because state was "seeking funds to which a statute allegedly entitle[d] it, rather than money in compensation for the losses"); *Beverly Hospital v. Bowen,* 872 F.2d 483, 487 (D.C.Cir.1989) (suit to enforce section of Medicaid Statute requiring Government to reimburse hospitals for certain expenses is "not impeded by sovereign immunity [because hospitals] seek only funds for which they are entitled by statute"); *Esch v. Yeutter,* 876 F.2d 976, 984 (D.C.Cir.1989) (suit to enforce statute requiring Government to pay certain agricultural subsidies not action for money damages).

In contrast, in *Hubbard v. Administrator, EPA,* the court determined that a suit seeking back pay, in addition to instatement of a job with the Government, could not be main-

tained under 5 U.S.C. § 702. *See,* 982 F.2d at 532–36. The *Hubbard* court explained:

> Specific remedies "attempt to give the plaintiff the very thing to which he was entitled." At the time the EPA violated Hubbard's rights by denying him an offer of a job as a criminal investigator, he had never worked for the EPA and thus was not entitled to any pay.... The only "entitlement" that the EPA deprived Hubbard of was the job offer he would have received except for the constitutional deprivation. Instatement is the specific relief for that deprivation, it gives Hubbard "the very thing" he was owed.... [Moreover], *Bowen*'s holding ... does nothing for Hubbard's cause. Hubbard's basic claim is not for the enforcement of any legal mandate that the EPA pay him a sum of money, rather, it is to force the EPA to offer him the job it denied him.

982 F.2d at 533–36.

Despite Dia Navigation's argument to the contrary, the claims for reimbursement of detention expenses constitute money damages for which 5 U.S.C. § 702 does not provide a waiver of sovereign immunity. As the Supreme Court and other cases have indicated, a monetary reward will constitute specific or equitable relief only when a plaintiff is *entitled* to payment of such a monetary award by the statute under which suit is brought. *Bowen,* 487 U.S. at 900, 108 S.Ct. at 2735; *Beverly Hospital,* 872 F.2d at 487; *Esch,* 876 F.2d at 984.

In this case, the INA neither entitles a carrier to monetary relief nor authorizes the payment of any funds to a carrier.[37] Thus, despite the fact that Dia Navigation describes its claim as one for "reimbursement," this is not a case such as *Beverly Hospital v. Bowen,* 872 F.2d 483, in which the statute provides a specific right to reimbursement or eligibility for any other monetary award. Indeed, at oral argument, Dia Navigation conceded it has no entitlement to money under the INA. *See* 23 July 1993 Tr. at 31.

Because the INA requires carriers to bear the detention costs of stowaways, the only possible right which the INA *may* provide to carriers is the right, in a specific situation, not to have unnecessary conditions of detention imposed by the INS which result in a carrier being forced to bear unreasonable expenses.[38] In such a situation, it is conceivable that a carrier may be entitled to injunctive and/or declaratory relief to avoid those specific conditions.[39] *Cf. Hubbard,* 982 F.2d at 533–36.

In contrast, when a carrier complies with conditions imposed by the INS and later seeks to recover a monetary award for what it perceives to be unreasonable expenses, the essence of such a claim is that the carrier has been damaged by an arbitrary and capricious order of the INS. Stated differently, such a claim is compensatory in nature because it seeks to remedy a suffered loss. Accordingly, an action for reimbursement of unreasonably-imposed detention expenses can only be

---

**37.** Dia Navigation cannot rely on the User Fee Statute to pay for any expenses incurred in the detention of stowaways because, by its plain language, the statute provides only for "expenses incurred *by the Attorney General* in ... providing detention and deportation services for excludable aliens arriving on commercial aircraft and vessels." 8 U.S.C. § 1356(h)(2)(A)(v) (emphasis added).

**38.** It is again noted that the INA neither imposes any specific conditions of stowaway confinement which must be followed by carriers nor expressly indicates that conditions imposed by the INS must be reasonable.

**39.** At oral argument, it was suggested that, upon being ordered to detain a stowaway and to bear the costs of that detention, a carrier could file for a temporary restraining order to allow the vessel

to sail. *See* 23 July 1993 Tr. at 18–19. As part of this process, a carrier could be required to post a bond to maintain the status quo and cover the costs of detention pending resolution of the stowaway's asylum case. *Id.* Once the stowaway's asylum case was decided, a hearing could be held on the reasonableness of the condition and on the duration of detention. *Id.* If the detention conditions and duration are found to be reasonable, the bond could be used to cover those costs; if unreasonable, the bond could be returned to the carrier. *Id.* In this way, any action by a carrier against the Government would be appear to be equitable in nature and may not encounter the sovereign immunity bar previously discussed. The Government conceded at oral argument that this course of action was plausible. *Id.* at 19.

characterized as compensatory money damages, for which Dia Navigation is precluded from asserting pursuant to 5 U.S.C. § 702.[40] *Bowen*, 487 U.S. at 893, 108 S.Ct. at 2731–32; *Hubbard*, 982 F.2d at 533–36; *see also, Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 524 (9th Cir.1989).

### B. *Motion for Summary Judgment of Dia Navigation*

In accordance with the foregoing discussion, the summary judgment motion of Dia Navigation is denied in all respects.

### *Conclusion*

For the reasons set forth above, the motion of the Government to dismiss the Complaint is construed as a motion for summary judgment and is granted; the motion of Dia Navigation for summary judgment is denied in its entirety.

---

**40.** Dia Navigation contends that "even if the court finds that [Dia Navigation's] monetary claim is not authorized by Section 702 of the APA ... the court still has statutory authority to order relief ... from the Congressional grant of supplemental jurisdiction pursuant to 28 U.S.C. § 1367." Dia SJ Brief at 31; *see also* Dia 12(b)(6) Brief at 11–14. This argument is without merit. The obstacle to Dia Navigation's monetary claim is not that subject matter jurisdiction is lacking, but rather that the doctrine of sovereign immunity precludes a party from asserting an action against the United States unless the United States waives its sovereign immunity. *Mitchell*, 445 U.S. at 538, 100 S.Ct. at 1351–52. With the exception of section 702 of the APA, Dia Navigation has pointed to no other waiver of sovereign immunity by the United States to support assertion of its claim for monetary relief.

Moreover, although at oral argument the parties were permitted to file supplemental briefs on what authority, if any, permitted a carrier to sue the United States for legal damages, the submission of Dia Navigation mostly re-states arguments already presented in the Dia SJ Brief and the Dia 12(b)(6) Brief. *See* Dia Supplemental Brief at 1–11. In the Dia Supplemental Brief, Dia Navigation does argue that the Tucker Act, 28 U.S.C. § 1491, permits recovery of money damages against the United States for money that has been improperly paid over to the United States. *See* Dia Supplemental Brief at 11–13. This argument appears to be without merit. As the Government argues, this type of Tucker Act claim concerns cases in which "the Government has the citizen's money in its pocket" and is typified by tax refund claims. *Clevenger Roofing & Sheet Metal Co. v. United States*, 8 Cl.Ct. 346, 353 (1985). In this case, Dia Navigation has not paid over any money to the United States and, instead, seeks to recover damages for money paid to third parties as a result of INS directives.